**In re UNIVERSAL SERVICE FUND TELEPHONE BILLING PRACTICES LITIGATION.**

**No. 02–MD–1468–JWL.**

United States District Court,
D. Kansas.

Dec. 1, 2003.

See also, 247 F.Supp.2d 1215.

Isaac L. Diel, Diel & Seelman, P.C., Prairie Village, KS, Jennifer F. Connolly, The Wexler Firm, Chicago, IL, Marc R. Stanley, Stanley, Mandel & Iola, Dallas, TX, for plaintiff.

Christopher J. Leopold, Mark M. Iba, Stinson, Morrison, Hecker, LLP—Kansas City, Kansas City, MO, Julie E. Grimaldi, Sprint, Mark D. Hinderks, Stinson, Morrison, Hecker, LLP—Overland Park, Overland Park, KS, Lynn S. McCreary, Bryan Cave, LLP—Kansas City, Kansas City, MO, Mark B. Blocker, Sidley, Austin, Brown & Wood, Chicago, IL, for defendants.

Fred Campbell, Michael Nilsson, Patrick O'Donnell, Harris, Wiltshire & Grannis, LLP, Washington, DC, for respondent.

Patricia C. Howard, Washington, DC, pro se.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This multidistrict litigation consists of numerous putative class action lawsuits arising from the practices of defendants AT & T Corporation ("AT & T") and Sprint Communications Company, L.P. ("Sprint") and non-party MCI WORLD-COM Network Services, Inc. and MCI WorldCom Communications, Inc. (collec-

tively "MCI")[1] of charging their customers to recoup these carriers' contributions to the federal Universal Service Fund ("USF") program. The Federal Communications Commission (the "FCC") administers the USF, a federal fund that subsidizes telecommunications service for low-income consumers, consumers in rural and high-cost areas, schools, libraries, and health care providers. 47 U.S.C. § 254. Long distance carriers such as defendants AT & T and Sprint are required to contribute a percentage of their revenues to maintaining the USF. *Id.* All major long distance carriers attempt to recover the costs of their contributions to the USF fund from their customers by way of line-item surcharges.

Plaintiffs are customers or former customers of AT & T, Sprint, and MCI who allege defendants engaged in an illegal scheme of conspiring to overcharge them for these USF fund pass-through charges, thereby creating a secret profit center that allowed defendants to deceptively advertise lower rates for their services. For example, plaintiffs allege that the USF contribution factor during most of 2001 and 2002 ranged from 6.68% to 7.28%, and that during this same time period AT & T and Sprint imposed USF surcharges on their customers ranging from 9.6% to 11.5%. AT & T and Sprint explain that this disparity is attributable to several factors such as their declining long distance revenues, uncollectible accounts, and their attempts to recoup their costs to administer the program.

From this general theory, which is explained in much more detail in plaintiffs' second consolidated and amended class action complaint ("second amended complaint"), plaintiffs assert the following

claims: (1) a claim seeking a declaratory judgment that the arbitration and limitation of liability provisions in AT & T and Sprint's service contracts are unenforceable; (2) an antitrust claim under the Sherman Act, 15 U.S.C. § 1, and sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15; (3) an unjust and unreasonable charges claim under § 201(b) of the Federal Communications Act, 47 U.S.C. §§ 151 *et seq.* ("FCA"); (4) an unreasonable discrimination claim under § 202(a) of the FCA; (5) a claim against AT & T under the New York consumer protection statute, N.Y. Gen. Bus. Law § 349; (6) a claim against Sprint under the Kansas Consumer Protection Act, K.S.A. §§ 50–623 *et seq.* ("KCPA"); (7) a money had and received claim; and (8) a breach of contract claim.

This matter is presently before the court on a variety of motions by defendants Sprint and AT & T including: (1) defendants' motions to compel arbitration and to dismiss or stay proceedings (Docs. 68 & 75); (2) defendants' motions to dismiss (Docs. 71 & 77); and (3) defendants' joint motion to dismiss or stay and for referral to the FCC under the doctrine of primary jurisdiction (Doc. 73). For the reasons explained below, the court will grant in part and deny in part all of these motions.

Specifically, the court will stay all of the claims of plaintiffs Michael Thome, Tomi White Bryan, and Elizabeth Tiffany against Sprint pending arbitration. Also, the court will stay plaintiff Thomas F. Cummings' claims against AT & T pending arbitration except insofar as some of those claims are based on USF fund pass-through charges prior to August 1, 2001. In addition, the court will compel arbitration of the residential customer plaintiffs' antitrust claims against long distance car-

---

**1.** These MCI entities are subsidiaries of WorldCom, Inc. and, like WorldCom, Inc., have filed for bankruptcy. The bankruptcy court declined to lift the automatic stay to allow plaintiffs to pursue their claims against MCI, and therefore plaintiffs are currently precluded from naming either of these MCI entities as defendants.

riers other than their own, except that the court will not compel plaintiff Cummings to arbitrate his antitrust claim against Sprint insofar as that claim is based on USF fund pass-through charges prior to August 1, 2001.

The court will dismiss plaintiffs' declaratory judgment, New York consumer protection statute, and money had and received claims, as well as plaintiffs' predetariffing antitrust and KCPA claims. However, the court will deny defendants' motions to dismiss with respect to plaintiffs' FCA claims as well as plaintiffs' post-detariffing antitrust, KCPA, and breach of contract claims.

Lastly, the court will refer plaintiffs' FCA claims to the FCC for primary jurisdiction. The court will, however, decline to refer plaintiffs' post-detariffing antitrust, KCPA, and breach of contract claims to the FCC. The court will allow the parties to proceed with discovery on those claims.

## I. DEFENDANTS' MOTION TO COMPEL ARBITRATION

Formerly, the FCA required interstate long distance carriers such as defendants to establish their rates, terms, and conditions of service in tariffs filed with the FCC. 47 U.S.C. § 203. However, the FCC implemented mandatory detariffing effective August 1, 2001. In lieu of tariffs, the FCC anticipated that carriers would establish "short, standard contracts" with their customers. *In re* Policy and Rules Concerning the Interstate, Interexchange Marketplace, 11 F.C.C.R. 20,730, ¶ 57 at 20,736 (1996) [hereinafter "*Second Report and Order*"]. By August 1, 2001, AT & T and Sprint had begun the process of forming these service contracts with their customers. As more thoroughly explained below, their residential customer service contracts contained arbitration clauses, and defendants now move to compel arbitration of their residential customers' claims pursuant to those arbitration clauses.

Specifically, Sprint moves the court to compel arbitration of the claims of its residential customers, plaintiffs Thome, Bryan, and Tiffany.[2] AT & T moves to compel arbitration of the claims of one of its customers, plaintiff Cummings.[3] In addition,

**2.** Sprint's motion was originally directed at the claims of plaintiffs Karihaloo, Thome, Bryan, Tiffany, Jordan, Mount, and Benjamin. However, on December 19, 2002, the court issued a memorandum and order remanding the cases filed by plaintiffs Jordan and Mount. *See generally In re Universal Serv. Fund Tel. Billing Practices Litig.*, 247 F.Supp.2d 1215 (D.Kan.2002). Then, on March 10, 2003, plaintiffs filed a second amended complaint (Doc. 148) that does not include any claims by plaintiffs Karihaloo or Benjamin. Thus, Sprint's motion is moot as to plaintiffs Karihaloo, Jordan, Mount, and Benjamin, and therefore the court will evaluate the motion only as to the claims of plaintiffs Thome, Bryan, and Tiffany.

**3.** AT & T does not move to compel arbitration of the claims of one of its residential customers, Roger Gerdes. Presumably this is be-

cause Mr. Gerdes is a California customer, and therefore his claims are impacted by the rulings in *Ting v. AT & T*, 182 F.Supp.2d 902 (N.D.Cal.2002), *aff'd in part, rev'd in part*, 319 F.3d 1126 (9th Cir.), *cert. denied*, — U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003). Thus, the court's order on defendants' motion to compel arbitration does not pertain to Mr. Gerdes' claims.

AT & T also suggests in a footnote in its reply brief that the court should compel arbitration of the claims of plaintiff Darrell D. Gest. The court will not consider this argument for two reasons. First, it was not raised in AT & T's initial motion or supporting memorandum. *See Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1288 (10th Cir.2003) (argument raised for the first time in reply brief is waived); *Coleman v. B–G Maint. Mgmt.*, 108 F.3d 1199, 1205 (10th Cir.1997) (issues not raised in the opening

both defendants ask the court to compel arbitration of the other residential customers' antitrust claims. In response, these plaintiffs argue that some of their claims are not within the scope of the arbitration clauses, that the arbitration clauses are unconscionable, and that arbitration does not provide them with an effective forum to vindicate their statutory rights. Defendants, however, dispute the scope of the arbitration clauses and further contend that plaintiffs' state law unconscionability challenges are preempted by the FCA and that plaintiffs' antitrust claims are arbitrable.[4]

## A. Legal Standard for a Motion to Compel Arbitration

The Courts of Appeals have uniformly held that "[i]n the context of motions to compel arbitration brought under the Federal Arbitration Act ('FAA'), 9 U.S.C. § 4 (2000), courts apply a standard similar to that applicable to a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir.2003) (applying a summary-judgment-like standard in ruling on a motion to compel arbitration); *see, e.g., Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir.2002) (same);

*Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n. 9 (3d Cir.1980) (same); *Brown v. Dorsey & Whitney, LLP*, 267 F.Supp.2d 61, 66–67 (D.D.C. 2003) (collecting case law on this issue and providing a helpful explanation of why the summary judgment standard applies); *Doctor's Assoc., Inc. v. Distajo*, 944 F.Supp. 1010, 1014 (D.Conn.1996) (same), *aff'd*, 107 F.3d 126 (2d Cir.), *cert. denied*, 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997). Although the Tenth Circuit has not precisely addressed this issue, there is no reason to believe that it would apply a different legal standard. *See, e.g., Gibson v. Wal–Mart Stores, Inc.*, 181 F.3d 1163, 1166 (10th Cir.1999) (reviewing the district court's grant of a motion to compel arbitration under the summary judgment standard where the parties agreed that standard applied); *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir.1997) (holding the district court must hold a jury trial on the existence of the agreement to arbitrate where the parties raise genuine issues of material fact regarding the making of the agreement to arbitrate (citing *Par–Knit Mills*, 636 F.2d at 54 & n. 9)); *see also, e.g., Phox v. Atriums Mgmt. Co.*,

---

brief are deemed abandoned or waived). More importantly, though, AT & T has not established the dates that Mr. Gest was an AT & T customer, and therefore the court is unable to ascertain which version(s) of AT & T's consumer services agreement govern Mr. Gest's claims. However, AT & T has represented to the court in a footnote in its reply brief that the parties have agreed that Mr. Gest will be bound by the outcome of AT & T's motion to compel arbitration. Thus, the court will analyze the parties' arguments with the understanding that the parties intend to treat Mr. Gest's claims like those of Mr. Cummings.

4. On May 27, 2003, the court issued a memorandum and order rejecting plaintiffs' argument that the court should not enforce the arbitration clauses because they are allegedly the product of an antitrust conspiracy in vio-

lation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *See generally In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02–MD–1468, 2003 WL 21254765, at *1–*6 (D.Kan. May 27, 2003). The court took the remainder of the motions under advisement in light of a circuit split on one of the threshold issues raised in these motions, *compare Ting*, 319 F.3d at 1126 (rejecting AT & T's argument that state law challenges to the arbitration clause are preempted by the FCA), *with Boomer v. AT & T Corp.*, 309 F.3d 404 (7th Cir.2002) (holding state law challenges to the arbitration clause are preempted by the FCA), because AT & T had filed a petition for certiorari in *Ting*. The Supreme Court recently denied AT & T's petition, *AT&T Corp. v. Ting*, —— U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003), and the court will now proceed to rule on the remaining issues raised in the parties' briefs.

*Inc.,* 230 F.Supp.2d 1279, 1282 (D.Kan. 2002) (applying a summary-judgment-like standard to a motion to compel arbitration); *Klocek v. Gateway, Inc.,* 104 F.Supp.2d 1332, 1336 (D.Kan.2000) (same).

Under this well-settled standard, summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The movant need not negate the other party's claim, but rather must simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir.1998)). In the context of a motion to compel arbitration, this requires the defendant to present evidence sufficient to demonstrate an enforceable agreement to arbitrate. *See Oppenheimer & Co. v. Neidhardt,* 56 F.3d 352, 358 (2d Cir.1995); *Phox,* 230 F.Supp.2d at 1282; *Klocek,* 104 F.Supp.2d at 1336.

Once the defendant has done this, the burden shifts to plaintiff to demonstrate a genuine issue of material fact as to the making of the agreement to arbitrate. *See Bensadoun,* 316 F.3d at 175; *Oppenheimer,* 56 F.3d at 358. To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246. If the plaintiff demonstrates a genuine issue of material fact, then a trial on this issue is required. 9 U.S.C. § 4 (if the making of the arbitration agreement is seriously disputed, then "the court shall proceed summarily to the trial thereof"); *Avedon Eng'g,* 126 F.3d at 1283 (holding the district court must hold a jury trial on the existence of the agreement to arbitrate where the parties raise genuine issues of material fact regarding the making of the agreement to arbitrate).[5]

### B. Discussion & Analysis

For the reasons explained below, the court concludes that the FCA preempts plaintiffs' state law substantive unconscionability, but not procedural unconscionability, challenges to the arbitration clauses. The court will compel arbitration of plaintiffs Thome, Bryan, and Tiffany's claims against Sprint because their claims are within the scope of the May 2002 version of the arbitration clause, Sprint did not implement the arbitration clause in a procedurally unconscionable manner, and plaintiffs have failed to demonstrate a genuine issue of material fact regarding whether arbitration is an effective forum for them to vindicate their statutory rights under the antitrust laws and the FCA.

In addition, the court will compel arbitration of most of Mr. Cummings' claims against AT & T because even if the court were to give the relevant factual findings in *Ting* preclusive effect, Mr. Cummings has failed to demonstrate that AT & T implemented his arbitration clause in a procedurally unconscionable manner. Also, like the Sprint plaintiffs, Mr. Cummings has failed to demonstrate a genuine issue of material fact regarding whether arbitration is an effective forum for him to vindicate his statutory rights under the

---

**5.** The court wishes to observe that it appears the parties anticipated the court would apply a summary-judgment-like standard because they all submitted matters outside the pleadings for the court's consideration.

antitrust laws and the FCA. The court does find, however, that some of Mr. Cummings' claims do not fall within the scope of the arbitration clause insofar as they are based on USF fund pass-through charges prior to August 1, 2001.

Lastly, the court will compel arbitration under equitable estoppel principles of plaintiffs' antitrust claims against long distance carriers other than their own, except that the court will not compel plaintiff Cummings to arbitrate his antitrust claim against Sprint insofar as that claim is based on USF fund pass-through charges prior to August 1, 2001.

### 1. Preemption Under the FCA

Defendants rely on the Seventh Circuit's holding in *Boomer v. AT & T Corp.*, 309 F.3d 404 (7th Cir.2002), to argue that the court should not consider plaintiffs' state law unconscionability arguments because the FCA preempts those state law challenges to the arbitration clauses. On the other hand, plaintiffs rely on the Ninth Circuit's holding in *Ting v. AT&T*, 319 F.3d 1126 (9th Cir.), *cert. denied*, — U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003), which rejected the argument that the FCA preempts state law challenges to the enforceability of arbitration clauses. The court has thoroughly analyzed the history of both of these cases as well as the reasoning of both courts, and is not entirely persuaded by either of them. The court concludes, however, that for the reasons set forth below the FCA preempts plaintiffs' state law substantive unconscionability, but not procedural unconscionability, challenges to the enforceability of the arbitration clauses.

### a. The FCA's Uniformity Principle

The law of federal preemption is well established. Congress has the power to preempt state law under the Supremacy Clause of the United States Constitution. U.S. Const. Art. VI, cl. 2 (providing that the laws of the United States are "the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding"). Congressional intent is the "ultimate touchstone" in any preemption analysis. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Federal law preempts state law in three circumstances: (1) express preemption, which occurs when Congress explicitly defines the extent to which federal law preempts state law; (2) conflict preemption, which occurs when state law actually conflicts with federal law; and (3) occupation-of-the-field preemption, which occurs when state law attempts to regulate "conduct in a field that Congress intended the Federal Government to occupy exclusively." *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 792 (10th Cir.2000). Here, express preemption and occupation-of-the-field preemption do not apply,[6] but defendants' argument that conflict preemption applies requires analysis.

██ "Conflict preemption exists in either of two situations: (1) when 'it is impossible for a private party to comply with both state and federal requirements,' or (2) when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Choate*, 222 F.3d at 795 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct.

---

6. Defendants briefly suggest that field preemption applies, but the court dispenses with that argument because the FCC clearly envisioned that state law would play some role in regulating long distance carriers' conduct in the wake of detariffing. *See Ting*, 319 F.3d at 1136 ("[F]ield preemption is not an issue be- cause state law unquestionably plays a role in the regulation of long distance contracts."); *Boomer*, 309 F.3d at 424 (also rejecting AT & T's field preemption argument). Thus, the court will focus its attention on defendants' far more colorable argument—*i.e.*, conflict preemption.

2270, 110 L.Ed.2d 65 (1990)). Defendants argue that allowing state law challenges to the validity of the arbitration clauses conflicts with the objectives of §§ 201(b) and 202(a) of the FCA. Those provisions generally require long distance carriers' rates, terms, and conditions of service to be just, reasonable, and nondiscriminatory. Specifically, they provide as follows:

> All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is declared to be unlawful.

47 U.S.C. § 201(b).

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give an undue or unreasonable preference or advantage to any particular person, class of persons, or locality or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

*Id.* § 202(a). In *Boomer*, the Seventh Circuit held that these two provisions of the FCA, "read together," preempt state law challenges to the validity of the arbitration clause because allowing state law challenges to the legality of contractual provisions would destroy the congressional objective under the FCA of promoting the uniformity of rates, terms, and conditions of service. 309 F.3d at 418–20, 424.

This court certainly agrees with the aspect of the Seventh Circuit's holding in *Boomer* that the FCA's uniformity principle survived detariffing. Congress directed the FCC to forbear from applying any regulation or provision of the FCA if the FCC determined that: (1) enforcement is unnecessary to ensure that rates are just, reasonable, and nondiscriminatory; (2) enforcement is unnecessary to protect consumers; and (3) forbearing from applying any such provision is in the public interest. 47 U.S.C. § 160(a). In light of this statute, the FCC issued a series of orders under which it determined that it would forbear from enforcing § 203 of the FCA—that is, it would detariff the industry. *Second Report and Order, supra; In re Policy and Rules Concerning the Interstate, Interexchange Marketplace,* 12 F.C.C.R. 15,014, 1997 WL 473330 (1997) [hereinafter *"Order on Reconsideration"*]; *In re Policy and Rules Concerning the Interstate, Interexchange Marketplace,* 14 F.C.R.C. 6004, 1999 WL 176557 (1999); *see also MCI WorldCom, Inc. v. FCC,* 209 F.3d 760 (D.C.Cir.2000) (upholding the FCC's detariffing rulings). In these orders, the FCC specifically stated that its decision to forbear from applying § 203's tariff-filing requirement did "not affect [the FCC's] enforcement of carriers' obligations under sections 201 and 202." *Order on Reconsideration, supra,* ¶ 77 at 15,057, 1997 WL 473330. The FCA's uniformity or non-discrimination principle is embodied in § 202(a), *Western Union Tel. Co. v. Esteve Bros. & Co.,* 256 U.S. 566, 571, 41 S.Ct. 584, 65 L.Ed. 1094 (1921) (citing the predecessor to § 202(a) as establishing the uniformity principle); *N. Am. Phillips Corp. v. Emery Air Freight Corp.,* 579 F.2d 229, 232 (2d Cir.1978) (explaining that the purpose of § 202(a) was to establish a uniformity of rates in all interstate transactions), and therefore the Congressional objective of achieving uniformity in rates, terms, and conditions of service remains in full force notwithstanding detariffing.

Applying the laws of all fifty states to defendants' interstate long distance service contracts would impede the Congressional objective of achieving this uniformity. If

courts were to apply all of those various laws, the result would be that no uniform body of federal law would emerge to guide long distance carriers such as AT & T and Sprint in attempting to ascertain the lawfulness of the provisions in their service agreements. Instead, they would be left to guess whether each provision passes muster under the laws of all fifty states. Defendants have attempted to avoid this patchwork of legal standards by including choice-of-law provisions in their contracts. The enforceability and scope of those provisions is not challenged in this case, but there are no guarantees that those choice-of-law provisions will be uniformly enforced under various state laws. *See, e.g., Ting v. AT & T,* 182 F.Supp.2d 902, 921–22 (N.D.Cal.2002) (declining to enforce the New York choice-of-law provision in AT & T's customer service agreement on public policy grounds), *aff'd in part, rev'd in part on other grounds,* 319 F.3d 1126 (9th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003). Thus, the lack of uniformity in the laws of all fifty states will in fact ultimately impede the Congressional objective of uniformity. Carriers such as defendants should be entitled to rely on uniform federal standards when determining how to fashion their service agreements. Application of a uniform federal standard, not application of the various fifty states' laws, will further the Congressional objective of achieving uniformity in long distance carriers' service contracts.

### b. Scope of FCA Preemption

■ Nevertheless, this FCA preemption principle is not absolute. It does not extend to state laws regarding all aspects of long distance carriers' conduct. In the aftermath of the FCC's detariffing orders, AT & T, Sprint, and MCI petitioned the FCC to clarify that federal law, not state law, continues to govern the determination as to whether a nondominant interexchange carrier's rates, terms, and condi-

tions are lawful. The FCC responded, stating:

> We therefore agree with AT & T, Sprint, and WorldCom that *the Communications Act continues to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory.* While the parties only sought certification that the Communications Act governs the determination as to the lawfulness of rates, terms, and conditions, we note that *the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment.* As stated in the *Second Report and Order,* consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.

*Order on Reconsideration, supra,* ¶ 77 at 15,057, 1997 WL 473330 (emphasis added). This ruling is entitled to deference. *See MCI,* 209 F.3d at 764 (holding the FCC's detariffing rulings are entitled to deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Thus, the FCA continues to govern the propriety of the actual terms and conditions of long distance service contracts. However, all other aspects of the carriers' conduct is subject to other federal and state laws.

■ In this case, plaintiffs raise both procedural and substantive unconscionability challenges to Sprint and AT & T's long distance service contracts. The challenges based on substantive unconscionability are in essence arguments that the terms and conditions of defendants' service contracts are unjust and unreasonable. As such, these arguments are preempted by the

FCA. Plaintiffs are only entitled to challenge the propriety of these provisions as arguable violations of the FCA, and plaintiffs assert no such allegations in this case. *See also Second Report & Order, supra,* ¶ 21, at 20,743 (envisioning the FCC complaint procedure would assure uniformity in carriers' rates, terms, and conditions).

■ On the other hand, plaintiffs' procedural unconscionability arguments challenge the validity of the contract formation process itself, not the actual propriety of the terms and conditions of the service contract. The FCC's *Order on Reconsideration* distinguishes those types of contract formation challenges and places them outside of the preemptive scope of the FCA. Defendants' service contracts include arbitration clauses that are governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (the "FAA"). Under the FAA, in evaluating whether the parties have entered into a valid arbitration agreement, it is well established that the court must look to state law contract principles. *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts ... should apply ordinary state-law principles that govern the formation of contracts."); *Perry v. Thomas,* 482 U.S. 483, 492–93 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987) (state law governing the validity, revocability, and enforceability of contracts generally applies under the FAA). An arbitration provision, just like any other contractual provision, is subject to "generally applicable contract defenses, such as fraud, duress or unconscionability." *Doctor's Assocs.,* 517 U.S. at 687, 116 S.Ct. 1652; *see, e.g., Circuit City Stores, Inc. v. Mantor,* 335 F.3d 1101, 1105–06 (9th Cir.2003) (applying state unconscionability law in determining the enforceability of an arbitration provision under the FAA); *Bess v. Check Express,* 294 F.3d 1298, 1306–07 (11th Cir.2002) (same); *Rickard v. Teynor's Homes, Inc.,* 279 F.Supp.2d 910, 914–18 (N.D.Ohio 2003) (same); *Faber v. Menard, Inc.,* 267 F.Supp.2d 961, 974–83 (N.D.Iowa 2003) (same).

Thus, the FAA allows plaintiffs to raise procedural unconscionability challenges to the enforceability of the arbitration clauses. Further, those arguments are not preempted by the FCA because they involve a challenge to the contract formation process, not to the propriety of the terms and conditions of the contract itself.

### 2. Sprint's Arbitration Clause

For the reasons explained below, the May 2002 version of Sprint's terms and conditions of service applies to the parties' dispute. Plaintiffs Thome, Bryan, and Tiffany do not dispute the fact that they are each parties to this contract. Instead, they argue: (1) the scope of the arbitration clause does not encompass all of their claims because (a) the May 2002 version does not operate retroactively and (b) their antitrust claim is not arbitrable under *Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511 (10th Cir.1995); (2) the arbitration clause is procedurally unconscionable under Kansas law; and (3) arbitration does not provide them with an effective forum to vindicate their statutory rights. The court disagrees, and will compel arbitration of all of these plaintiffs' claims against Sprint.

#### a. Implementation of the Arbitration Clause

In May of 2001, Sprint sent out a mailing notifying its long distance customers in essentially lay terminology of the then-upcoming detariffing. The notice advised Sprint's customers that the new terms and

conditions of service would be identical to those on file with the FCC on July 31, 2001, and would be posted on Sprint's website after July 31, 2001.

Effective July 1, 2001, Sprint revised its tariff to include a mandatory arbitration provision requiring that all disputes arising from the agreement (*i.e.*, the tariff) be resolved in small claims court, through state or federal regulatory agencies, or via final and binding arbitration in accordance with the FAA.

In a letter dated August 22, 2001, Sprint sent each of its long distance customers a letter. On the back of the letter was a list of answers to frequently asked questions (an "FAQ sheet"). One of the questions on the FAQ sheet was, "Is there any other information I should take note of?" The answer was "Yes," the terms and conditions of service included a mandatory arbitration clause. Enclosed with the letter was a booklet containing the terms and conditions of service, which included a mandatory arbitration provision that was identical to the arbitration provision in the tariff except that it added paragraph numbering.

Then, by way of a letter dated May 29, 2002, Sprint sent its customers another revised booklet containing updated rates, terms, and conditions (the "May 2002 version of Sprint's terms and conditions"). This booklet contained a modified dispute resolution provision, as follows:

**8. DISPUTE RESOLUTION**

**8.1.** This Section applies to any dispute between you and Sprint arising out of or relating to this Agreement, including any dispute you may have regarding the Services, charges for Services, advertising, or any other dispute that either you or Sprint has that is related to this Agreement, even if the dispute arises after your Service has terminated. All disputes must be resolved as described in this Section. **YOU AGREE THAT ANY DISPUTE WILL NOT BE RESOLVED BY A JUDGE OR JURY IN COURT (EXCEPT FOR SMALL CLAIMS COURT, IF APPLICABLE).**

**8.2.** If you have a dispute with Sprint, you must first call Sprint's Customer Service department. . . .

**8.3.** If either party is unable to resolve its dispute within 60 days of notifying the other party of the dispute, either party has the right to take the dispute to small claims court if it qualifies under the rules of the court. Alternatively, either party may request arbitration as described below.

**8.4. MANDATORY ARBITRATION OF DISPUTES. ANY CLAIM, CONTROVERSY OR DISPUTE OF ANY KIND BETWEEN YOU AND SPRINT AND/OR ANY OF ITS EMPLOYEES, AGENTS, AFFILIATES OR OTHER REPRESENTATIVES, WHETHER SOUNDING IN CONTRACT, STATUTE OR TORT, INCLUDING FRAUD, MISREPRESENTATION, FRAUDULENT INDUCEMENT OR ANY OTHER LEGAL OR EQUITABLE THEORY AND REGARDLESS OF THE DATE OF ACCRUAL OF SUCH CLAIM, CONTROVERSY OR DISPUTE WILL BE RESOLVED BY FINAL AND BINDING ARBITRATION AS PRESCRIBED IN THIS SECTION. THE FEDERAL ARBITRATION ACT, NOT STATE LAW, GOVERNS THE QUESTION OF WHETHER A CLAIM IS SUBJECT TO ARBITRATION.**

**8.5.** A single arbitrator engaged in the practice of law will conduct the arbitration. The arbitrator will be selected according to the rules of the American Arbitration Association or JAMS or, alternatively, may be selected by agreement of the parties, who will cooperate in good faith to select the arbitrator.

The arbitration will be conducted by and under the then-applicable rules of American Arbitration Association or JAMS, as applicable. All expedited procedures prescribed by the applicable rules will apply. Any required hearing fees and costs will be paid by the parties as required by the applicable rules or as required by applicable law, but the arbitrator will have the power to apportion such costs as the arbitrator deems appropriate.

8.6. The arbitrator's decision and award will be final and binding, and judgment on the award rendered by the arbitrator may be entered in any court with jurisdiction.

8.7. If any party files a judicial or administrative action asserting a claim that is subject to arbitration and another party successfully stays such action or compels arbitration, the party filing that action must pay the other party's costs and expenses incurred in seeking such stay or compelling arbitration, including attorney's fees.

8.8. In addition to the procedures described in this Section for resolving a dispute, you may also have the right to file a complaint with an appropriate federal or state regulatory agency.

8.9. If any portion of this Dispute Resolution Section is determined to be invalid or unenforceable, the remainder of the Section remains in full force and effect.

May 2002 Version of Sprint's Terms & Conditions § 8 (emphasis in original). The booklet contained the following choice-of-law clause: "This Agreement and all claims relating to the relationship between the parties are governed by federal law and the laws of the State of Kansas, but excluding Kansas' choice of law principles." *Id.* § 13.5. It also contained the following severability provision: "If any provision is held to be illegal, or unenforce-able, this Agreement's unaffected provisions will remain in effect." *Id.* § 13.6. In addition, the first paragraph in the booklet stated:

**YOUR ENROLLMENT IN, USE OF OR PAYMENT FOR THE SERVICES CONSTITUTES YOUR ACCEPTANCE OF AND AGREEMENT TO THIS AGREEMENT. IF YOU DO NOT AGREE WITH SPRINT'S RATE SCHEDULES OR TERMS AND CONDITIONS, DO NOT USE THE SERVICES AND CALL SPRINT CUSTOMER SERVICE IMMEDIATELY FOR INSTRUCTIONS ON HOW TO CANCEL THE SERVICES.**

*Id.* § 1.1 (emphasis in original).

It is undisputed that Sprint sent all of these mailings to plaintiffs Thome, Bryan, and Tiffany. It is also undisputed that Ms. Bryan and Ms. Tiffany are still Sprint customers, and that Mr. Thome continued to be a Sprint customer until August of 2002, well after the last mailing in May of 2002.

### b. Scope of the Arbitration Clause

██ The scope of an arbitration clause, as a matter of contractual interpretation, is a question of law for the court as long as it does not depend on extrinsic evidence and is susceptible of only one reasonable interpretation. *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir.1993). The May 2002 version of the dispute resolution provision provides that all claims, controversies, or disputes between the parties will be resolved by arbitration "*regardless of the date of accrual* of such claim, controversy or dispute" (emphasis added). This language plainly and unambiguously states that the May 2002 version of the dispute resolution provision applies to all of the parties' claims, controversies, and disputes, regardless of whether they accrued before or

after this revised provision took effect in May of 2002. The FAA specifically gives full force and effect to such retroactive arbitration provisions. 9 U.S.C. § 2 (providing for the enforceability of "an agreement in writing to submit to arbitration *an existing controversy*" (emphasis added)); *see, e.g., Zink,* 13 F.3d at 333–34 (enforcing an arbitration agreement even with respect to transactions that pre-dated the agreement where the agreement required arbitration of "[a]ny controversy between [the parties] arising out of [plaintiff's] business of this agreement" (second and third brackets in original; emphasis removed)); *In re Currency Conversion Fee Antitrust Litig.,* 265 F.Supp.2d 385, 406–07 (S.D.N.Y.2003) (rejecting the plaintiffs' argument that they could not be forced to arbitrate claims that arose prior to the time the parties entered into an arbitration agreement where the language of the arbitration provision was broad enough to encompass pre-existing claims); *Lloyd v. MBNA Am. Bank, N.A.,* No. 00–109–SLR, 2001 WL 194300, at *4 (D.Del. Feb.22, 2001) (same); *Beneficial Nat'l Bank, U.S.A. v. Payton,* 214 F.Supp.2d 679, 688–89 (S.D.Miss.2001) (holding the court may apply an arbitration clause retroactively if it contains retroactive time-specific language); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. King,* 804 F.Supp. 1512, 1514 (M.D.Fla.1992) (enforcing an arbitration provision by its plain terms and recognizing that an arbitration agreement may be applied retroactively).

This finding is further reinforced by the "strong federal policy favoring arbitration for dispute resolution." *Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1514 (10th Cir.1995) (quotation omitted). While a party may not be compelled to submit a dispute to arbitration unless it has agreed to do so, federal arbitration policy requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses*

*H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648–50, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (arbitration agreements are favored and are to be broadly construed with doubts being resolved in favor of coverage). Thus, arbitration should be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The May 2002 version of the arbitration provision is certainly susceptible of an interpretation that covers all of the claims of plaintiffs Thome, Bryan, and Tiffany, even claims that already existed at the time it went into effect.

█ The May 2002 version of the arbitration clause is also readily susceptible of an interpretation that includes plaintiffs' antitrust claim. This arbitration clause broadly encompasses all claims, controversies, and disputes between the parties "whether sounding in contract, *statute* or tort, including fraud, misrepresentation, fraudulent inducement or any other legal or equitable theory" (emphasis added). Plaintiffs' antitrust claims are statutory claims, and therefore fall within the scope of this provision and are arbitrable. *See, e.g., In re Currency Conversion Fee Antitrust Litig.,* 265 F.Supp.2d at 406 (finding the plaintiffs' antitrust claims related to an agreement containing an arbitration clause); *B–S Steel of Kan., Inc. v. Tex. Indus.,* 229 F.Supp.2d 1209, 1226–27 (D.Kan.2002) (finding the plaintiffs' antitrust claims were within the scope of a provision requiring arbitration of "[a]ny controversy or claim arising out of or related to these Conditions of Sale or any

other transactions between Buyer and Seller").

*Coors* does not, as plaintiffs contend, stand for the broad proposition that horizontal price-fixing antitrust claims are not arbitrable per se, but rather that the arbitrability of those claims depends, as with any other claim, upon the scope of the agreement to arbitrate. 51 F.3d at 1515–16 ("A dispute within the scope of the contract is still a condition precedent to the involuntary arbitration of antitrust claims."). In *Coors*, the arbitration clause provided for arbitration of "any dispute arising in connection with the implementation, interpretation or enforcement of *this Agreement*." *Id.* at 1515 (emphasis added). The Tenth Circuit held that language was only broad enough to cover antitrust disputes that had a connection to the agreement. *Id.* at 1516; *see, e.g., In re Currency Conversion Fee Antitrust Litig.,* 265 F.Supp.2d at 409–10 (explaining that the result in *Coors* was a result of the Tenth Circuit's interpretation of the particular arbitration clause at issue in that case); *B–S Steel,* 229 F.Supp.2d at 1226–27 (same). By comparison, here, plaintiffs antitrust claims expressly fall within the scope of the arbitration clause.[7]

Accordingly, all of the claims, controversies, and disputes between Sprint and plaintiffs Thome, Bryan, and Tiffany, including plaintiffs' antitrust claim, are arbitrable under the May 2002 version of Sprint's arbitration clause.

### c. Procedural Unconscionability[8]

Under Kansas law, "a party who freely enters a contract is bound by it even though it was unwise or disadvantageous to the party, so long as the contract is not unconscionable." *Moler v. Melzer,* 24 Kan. App.2d 76, 77, 942 P.2d 643, 645 (1997). Mere inequality of bargaining power is insufficient to render a contract unconscionable. *Aves ex rel. Aves v. Shah,* 258 Kan. 506, 520, 906 P.2d 642, 652 (1995); *Frets v. Capitol Fed. Sav. & Loan Ass'n,* 238 Kan. 614, 623, 712 P.2d 1270, 1277 (1986); *Wille v. Southwestern Bell Tel. Co.,* 219 Kan. 755, 759, 549 P.2d 903, 907 (1976). "[T]here must be additional factors such as deceptive bargaining conduct ... to render the contract ... unconscionable." *Wille,* 219 Kan. at 759, 549 P.2d at 907. The burden of establishing unconscionability is on the party attacking the contract. *Adams v. John Deere Co.,* 13 Kan.App.2d 489, 492, 774 P.2d 355, 357 (1989).

It is undisputed that Sprint was of superior bargaining strength and presented its terms and conditions of service, including the arbitration clause, to its customers as a form contract on a take-it-or-leave-it basis. However, there was no element of deception. Sprint's customers were charged with constructive notice that their claims against Sprint were arbitrable as early as July 1, 2001. *See Evanns v. AT&T Corp.,* 229 F.3d 837, 840 (9th Cir.2000) (under the filed-tariff doctrine customers are charged with notice of the terms of a tariff). Then,

---

**7.** To the extent that *Coors* could arguably be read to require a connection between the arbitration agreement and the antitrust claims, that requisite connection exists here. Plaintiffs' antitrust claim alleges that AT & T, Sprint, and MCI conspired to fix their USF pass-through rates at artificially high and non-competitive levels, and to implement similar arbitration clauses to attempt to shield themselves from liability for their wrongful

conduct. Sprint's Carrier Universal Service Charge percentage is set forth in subsection 4.1 of the terms and conditions of service, and its arbitration provision is set forth in section 8. Thus, plaintiffs' antitrust claims have a connection to the provisions in the contract.

**8.** The parties agree that the choice-of-law provision requires the court to apply the FAA along with Kansas law.

the FAQ sheet in Sprint's August 2001 mailing specifically directed its customers' attention to the significance of the dispute resolution provision. The arbitration clause is written in relatively plain language, not confusing terms, and emphasizes important aspects in bold all-capital lettering. *See, e.g., Frets*, 238 Kan. at 622, 712 P.2d at 1277 (finding no unconscionability where, among other things, the relevant provision was "not buried in a mass of fine print"); *Wille*, 219 Kan. at 763–64, 549 P.2d at 910–11 (same, where terms and conditions were set out in "clearly legible type" and were "not couched in confusing terms"). Sprint's customers had ample time to review those terms and conditions, whether they chose to do so or not, and cancel their service with Sprint if they did not wish to be bound by them.[9] Accordingly, the court is unpersuaded that Sprint's arbitration clause should not be enforced based on principles of procedural unconscionability.

### d. Effective Forum to Vindicate Statutory Rights[10]

■ Plaintiffs Thorne, White, and Tiffany also argue that arbitration is not an effective forum for them to vindicate their statutory rights under the antitrust laws and the FCA because the agreement bans: (1) class actions, (2) treble damages, and (3) attorneys' fee awards. The Supreme Court has recognized that federal statutory claims can be appropriately resolved through arbitration and has enforced agreements involving such claims. *See generally, e.g., Gilmer v. Interstate/John-son Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (compelling arbitration of claims under the Age Discrimination in Employment Act); *Rodriquez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (same, Securities Act of 1933); *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (same, Securities Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations Act); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (same, Sherman Act). However, such claims may be arbitrated only " 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum.' " *Gilmer*, 500 U.S. at 28, 111 S.Ct. 1647 (quoting *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. 3346); *accord Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000); *see also Shankle v. B–G Maint. Mgmt. of Colo., Inc.*, 163 F.3d 1230, 1234 (10th Cir.1999) ("[A]n arbitration agreement that prohibits the use of the judicial forum as a means of resolving statutory claims must also provide for an effective and accessible alternative forum.").

■ The May 2002 version of Sprint's terms and conditions of service, which as discussed previously is the version that applies to the Sprint plaintiffs' claims, does not by its terms ban class-wide arbitration. Rather, it is silent on this issue. Under these circumstances, the availability of

---

9. Also, Sprint is selling a fungible product in a competitive market, and there is no evidence in the record that plaintiffs could not have readily purchased this same fungible product from another long distance carrier who, unlike AT & T, Sprint, and MCI, did not require its customers to arbitrate disputes. Although plaintiffs allege that they did not have any real choice but to accept the contract because nearly every major long dis-tance telephone company requires arbitration on almost identical terms, they have not submitted any evidence to support this allegation. In any event, the court is unpersuaded that this factor alone would push the arbitration clause beyond the verge of enforceability.

10. Defendants do not argue that this body of case law is displaced by the FCA.

class-wide arbitration is an issue that must be decided by the arbitrator in the first instance. *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 2407, 156 L.Ed.2d 414 (2003) (holding the arbitrator must decide whether arbitration is available on a class-wide basis where the arbitration clause is silent on that issue); *see Pedcor Mgmt. Co., Inc. Welfare Benefit Plan v. Nations Personnel of Texas, Inc.,* 343 F.3d 355 (5th Cir.2003) (analyzing *Green Tree* and concluding that the arbitrator must first decide whether class arbitration is available or forbidden where the arbitration agreement does not clearly forbid class arbitration).

Further, the May 2002 version does not expressly ban treble damages. Rather, it states that Sprint is not liable for "punitive or exemplary damages." The Supreme Court has held that similar provisions limiting awards of punitive and exemplary damages do not necessarily prohibit the arbitrator from awarding treble damages on a RICO claim. *PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 123 S.Ct. 1531, 1535–36, 155 L.Ed.2d 578 (2003). The Court held this dispute was one for the arbitrator to decide in the first instance. *Id.* at 1536, 123 S.Ct. 1531. Similarly, here, the extent to which the limitation of liability on punitive or exemplary damages actually bans a treble damage award on plaintiffs' antitrust claim is disputable. Therefore, that issue must first be resolved by the arbitrator.[11]

 Also, the May 2002 version of Sprint's terms and conditions of service does not by its terms ban an award of attorneys' fees. Like the availability of class-wide arbitration, it is silent on this issue. To the extent that this issue is disputable, it is a question for the arbitrator in the first instance under the reasoning of the Supreme Court in both *Green Tree* and *PacifiCare.* The court does wish to observe, however, that the dispute resolution provision provides for arbitration of any claim, controversy or dispute, including those "sounding in . . . statute." Thus, the arbitrator is imbued with authority to award any attorneys' fees available under the antitrust laws and/or the FCA to the extent there is a statutory basis for such an award.

The court also wishes to acknowledge that plaintiffs raised one other argument— that is, that arbitration is prohibitively expensive. Plaintiffs initially raised this argument in the context of their argument that the arbitration clause is substantively unconscionable, and the court has rejected this substantive unconscionability argument as preempted by the FCA. Nevertheless, the fact that arbitration may be prohibitively expensive could bear on the issue of whether the arbitral forum is an effective one for plaintiffs to vindicate their statutory rights. Thus, out of an abundance of caution, the court will address that argument here.

The only language in the May 2002 version of Sprint's terms and conditions of service that governs the extent to which each party bears the initial costs of arbitration or what those costs might be provides as follows: "Any required hearing fees and costs will be paid by the parties as required by the applicable rules or as required by applicable law, but the arbitrator will have the power to apportion such costs as the arbitrator deems appropriate."

---

**11.** The court does note, however, that the Court in *PacifiCare* observed that the treble damages and attorneys' fees provisions in the antitrust laws are generally regarded as remedial rather than punitive in nature. 123 S.Ct. at 1535; *see also Inv. Partners, L.P. v. Glam-our Shots Licensing, Inc.,* 298 F.3d 314, 316–17 (5th Cir.2002) (holding a prohibition in the parties' arbitration agreement against awarding punitive damages does not extend to statutory treble damages).

The court recognizes that this provision could theoretically deter litigants from vindicating their statutory rights under the antitrust laws and the FCA because it threatens to impose unpredictable costs on plaintiffs who seek to arbitrate their claims. However, such a theoretical possibility is insufficient for the court to decline to compel arbitration of those claims.

In *Green Tree Financial Corp.-Alabama v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), the Supreme Court evaluated the propriety of an arbitration provision that was silent with respect to costs. The Court reasoned:

It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter.... The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

*Id.* at 90–91, 121 S.Ct. 513. Thus, a party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of showing the likelihood of incurring such costs. *Id.* at 92, 121 S.Ct. 513. How detailed that showing must be is unclear. *Id.* What is clear, however, is that the plaintiff must make *some* showing on this point. *Id.; see also Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (holding the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration); *McMahon,* 482 U.S. at 227, 107 S.Ct. 2332 (same).

Likewise, here, plaintiffs have not presented any evidence from which the court can ascertain whether requiring them to arbitrate their claims might be so expensive that it would deter them from vindicating their statutory rights. The court does recognize one distinction between the arbitration provision at issue in *Green Tree* and the provision at issue in this case: in *Green Tree* the provision was silent regarding the costs of arbitration whereas in this case the provision contains a cost-splitting provision. However, like the provision at issue in *Green Tree,* the provision at issue in this case still fails to provide the court with any meaningful information regarding the costs of arbitration. Further, plaintiffs have submitted no evidence to support their argument regarding the costs of arbitration or their willingness or ability to pay those costs. In fact, they have submitted less meaningful discussion and evidence on this point than the plaintiff in *Green Tree. See Green Tree,* 531 U.S. at 91 n. 6, 121 S.Ct. 513 (discussing plaintiff's arguments regarding the costs of arbitration); *cf. Blair v. Scott Specialty Gases,* 283 F.3d 595, 610 (3d Cir.2002) (remanding to the district court to determine the effect of a cost-splitting provision where the claimant submitted an affidavit of her limited financial capacity); *Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 668–70, 676 (6th Cir.2003) (declining to enforce cost-splitting provisions where the record revealed the potential costs of arbitration). In sum, plaintiffs have failed to satisfy their burden of proof under *Green Tree.* Accordingly, the court must reject plaintiffs' argument as conclusory and unsupported by the record, and compel arbitration of plaintiffs' statutory claims.

The Tenth Circuit's holding in *Shankle v. B–G Maintenance Management of Colorado, Inc.,* 163 F.3d 1230 (10th Cir.1999), does not compel a different result. In

*Shankle,* the Tenth Circuit held that a mandatory arbitration agreement containing a fee-splitting provision is unenforceable as to claims under Title VII, the Americans with Disabilities Act, and Age Discrimination in Employment Act. *Id.* at 1233. This opinion could arguably be interpreted as adopting a broad per se rule against the enforceability of such agreements. However, two aspects of this opinion are noteworthy. First, to the extent that *Shankle* appeared to announce a broad per se rule against the enforceability of such cost-splitting agreements, that holding is suspect in light of the Supreme Court's subsequent holding in *Green Tree,* which adopted a case-by-case approach to determining whether the potential costs of arbitration denies potential litigants the opportunity to effectively vindicate their statutory rights. Notably, the cases adopting rules that such cost-splitting provisions are per se unenforceable pre-dated *Green Tree,* whereas the Courts of Appeals have uniformly adopted case-by-case approaches to evaluating the enforceability of such cost-splitting provisions since *Green Tree* with the plaintiff bearing the burden of proving that arbitration is prohibitively expensive. *Compare Morrison,* 317 F.3d at 663–65 (adopting a case-by-case approach to evaluating cost-shifting provisions); *Blair,* 283 F.3d at 610 (rejecting the plaintiff's argument that the mere existence of a cost-splitting provision satisfies the claimant's burden of proving the likelihood of incurring prohibitive costs in light of *Green Tree* ); *Bradford v. Rockwell Semiconductor Sys., Inc.,* 238 F.3d 549, 556 (4th Cir.2001) (holding *Green Tree* requires a case-by-case determination of whether a cost-splitting provision renders an arbitration agreement unenforceable), *with Shankle,* 163 F.3d at 1235 (appearing to have adopted a per se rule prior to the Court's ruling in *Green Tree* ); *Paladino v. Avnet Computer Techs., Inc.,* 134 F.3d 1054, 1062 (11th Cir.1998) (same);

*Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1481 (D.C.Cir.1997) (same).

More importantly, though, for purposes of this case, the result reached by the Tenth Circuit in *Shankle* passes muster even under *Green Tree* because in *Shankle* the plaintiff established a factual record that the costs of arbitration would prevent him from vindicating his statutory rights. *Shankle,* 163 F.3d at 1234–35 (discussing the fact that Mr. Shankle could not afford to pay an arbitrator between $1,875 and $5,000 to resolve his claims); *see, e.g., Shankle v. B–G Maint. Mgmt. of Colo.,* No. 96N2932, 1997 WL 416405, at *1–*2 (D.Colo. Mar.24, 1997) (discussing the evidence the plaintiff presented regarding the costs of arbitration); *see also, e.g., Morrison,* 317 F.3d at 658 n. 4 (remarking that *Shankle* could be interpreted as employing a case-by-case approach); *Bradford,* 238 F.3d at 555 (observing that although *Shankle* found the fee-splitting provision unenforceable, "it framed its analysis in terms of the complaining party's actual inability to afford the arbitration costs and fees"). Unlike the plaintiff in *Shankle,* plaintiffs here have failed to provide any factual record to support their conclusory allegation that the costs of arbitration would prohibit them from having an effective forum to vindicate their statutory rights.

In sum, plaintiffs have failed to satisfy their burden of proving that arbitration will not serve as an effective and accessible forum for them to vindicate their statutory rights under the antitrust laws or the FCA. Accordingly, the arbitration clause is enforceable with respect to plaintiffs Thome, Bryan, and Tiffany's antitrust and FCA claims against Sprint.

### 3. AT & T's Arbitration Clause

As discussed below, the only evidence before the court is that Mr. Cummings ceased being an AT & T customer before

AT & T modified its dispute resolution provision effective March 1, 2002. Therefore, the arbitrability of his claims is governed by the earliest version of AT & T's consumer services agreement. Mr. Cummings does not dispute the fact that he is a party to this contract. Instead, he raises four other arguments: (1) the scope of the arbitration clause does not encompass (a) his claims that arose prior to August 1, 2001, or (b) his antitrust claim under *Coors;* (2) the court should give preclusive effect to the court's findings of fact in *Ting;* (3) the arbitration clause is procedurally unconscionable under New York law; and (4) arbitration does not provide him with an effective forum to vindicate his rights under the antitrust laws or the FCA. With the exception of the aspect of some of Mr. Cummings' claims involving USF fund pass-through charges before August 1, 2001, the court will compel arbitration of Mr. Cummings' claims against AT & T.

### a. AT & T's Consumer Services Agreement

In May of 2001, AT & T began mailing copies of its consumer services agreement to its residential customers. The mailing included a cover letter, an FAQ sheet, and a copy of the agreement. The letter explained that the agreement would apply to AT & T's services effective August 1, 2001. It stated that the agreement "describes our new binding arbitration process, which uses an objective third party rather than a jury for resolving any disputes that may arise." It further stated: **"Please be assured that your AT & T service or billing will not change under the AT & T Consumer Services Agreement; there's nothing you need to do"** (emphasis in original). The FAQ sheet stated: "Q: Is there anything in this Agreement that is different from the terms and conditions filed with the FCC?" The answer to this question was,

A: Yes. There are two notable changes in particular:

(1) *Binding arbitration.* Any disputes that may arise between AT & T and customers that cannot be resolved informally must now be resolved through binding arbitration (or through small claims court if you choose). In arbitration, disputes must be decided by an objective third party rather than a jury. Arbitration is a quicker and more convenient way to settle disputes without the hassle and cost of a court case. It's in addition to the remedies consumers have through federal and state agencies.

The agreement (hereinafter "AT & T's CSA") included the following provision requiring disputes to be resolved in small claims court, through state or federal regulatory agencies, or via mandatory arbitration:

**7. DISPUTE RESOLUTION.**
**IT IS IMPORTANT THAT YOU READ THIS ENTIRE SECTION CAREFULLY. THIS SECTION PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION. YOU CONTINUE TO HAVE CERTAIN RIGHTS TO OBTAIN RELIEF FROM A FEDERAL OR STATE REGULATORY AGENCY.**
**a. Binding Arbitration.** The arbitration process established by this section is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. You have the right to take any dispute that qualifies to small claims court rather than arbitration. All other disputes arising out of or related to this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any

other legal or equitable theory) must be resolved by final and binding arbitration. This includes any dispute based on any product, service, or advertising having a connection with this Agreement and any dispute not finally resolved by a small claims court. The arbitration will be conducted by one arbitrator using the procedures described by this Section 7. If any portion of this Dispute Resolution Section is determined to be unenforceable, then the remainder shall be given full force and effect.

The arbitration of any dispute involving $10,000 or less shall be conducted in accordance with the Consumer Arbitration Rules of the American Arbitration Association ("AAA"), as modified by this Agreement, which are in effect on the date a dispute is submitted to the AAA. The AAA's Commercial Arbitration Rules and fee schedules will apply to any disputes in excess of $10,000. You have the right to be represented by counsel in an arbitration. In conducting the arbitration and making any award, the arbitrator will be bound by and strictly enforce the terms of this Agreement and may not limit, expand, or otherwise modify its terms.

NO DISPUTE MAY BE JOINED WITH ANOTHER LAWSUIT, OR IN AN ARBITRATION WITH A DISPUTE OF ANY OTHER PERSON, OR RESOLVED ON A CLASS–WIDE BASIS. THE ARBITRATOR MAY NOT AWARD DAMAGES THAT ARE NOT EXPRESSLY AUTHORIZED BY THIS AGREEMENT AND MAY NOT AWARD PUNITIVE DAMAGES OR ATTORNEYS' FEES UNLESS SUCH DAMAGES ARE EXPRESSLY AUTHORIZED BY A STATUTE. YOU AND AT & T BOTH WAIVE ANY CLAIMS FOR AN AWARD OF DAMAGES THAT ARE EXCLUDED UNDER THIS AGREEMENT.

b. **Arbitration Information and Filing Procedures.** Before you take a dispute to arbitration or to small claims court, you must first contact our customer account representatives. . . . Information about the arbitration process and the AAA's Arbitration Rules and its fees are available from the AAA on the Internet at *www.adr.org,* or by contacting us at *www.att.com/serviceguide/home* or AT & T, P.O. Box 944078, Maitland, Florida 32794–4078. The arbitration will be based only on the written submissions of the parties and the documents submitted to the AAA relating to the dispute, unless either party requests that the arbitration be conducted using the AAA's telephonic, online, or in-person procedures. Additional charges may apply for these procedures. Any in-person arbitration will be conducted at a location that the AAA selects in the state of your primary residence. Any arbitration shall remain confidential. Neither you nor AT & T may disclose the existence, content, or results of any arbitration or award, except as may be required by law, or to confirm and enforce an award.

ANY CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT WITHIN TWO YEARS AFTER THE DATE THE BASIS FOR THE CLAIM OR DISPUTE FIRST ARISES.

c. **Fees and Expenses of Arbitration.** You must pay the applicable AAA filing fee when you submit your written request for arbitration to the AAA. The AAA's filing fee and administrative expenses for a document arbitration will be allocated according to the AAA's Rules, except that for claims of less than $1,000, you will only be obligated to pay a filing fee of $20 and we will pay all of the AAA's other costs and fees. If you

elect an arbitration process other than a document (or "desk") arbitration, you must pay your allocated share of any higher administrative fees and costs for the process you select. Unless applicable substantive law provides otherwise, each party will pay its own expenses to participate in the arbitration, including attorneys' fees and expenses for witnesses, document production, and presentation of evidence. The prevailing party may, however, seek to recover the AAA's fees and the expenses of the arbitrator from the other party.

AT & T's CSA § 7 (emphasis in original). The agreement contained a New York choice-of-law provision:

This Agreement will be governed by the law of the State of New York, without regard to its choice of law rules, except that the arbitration provisions in Section 7 will be governed by the Federal Arbitration Act. This governing law provision applies no matter where you reside, or where you use or pay for the Services.

*Id.* § 8(f). It also contained the following severability provision: "If any part of this Agreement is found invalid, the rest of the Agreement will remain valid and enforceable." *Id.* § 8(e). Further, the second paragraph in the agreement stated:

**BY ENROLLING IN, USING, OR PAYING FOR THE SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT. IF YOU DO NOT AGREE TO THESE PRICES, CHARGES, TERMS AND CONDITIONS, DO NOT USE THE SERVICES, AND CANCEL THE SERVICES IMMEDIATELY BY**

**CALLING AT & T AT 1 888 288–4099 FOR FURTHER DIRECTIONS.**

*Id.* ¶ 2 (emphasis in original).

It is undisputed that AT & T sent this mailing to plaintiff Cummings. AT & T modified its consumer services agreement effective March 1, 2002. However, the only evidence before the court regarding Mr. Cummings' long distance service with AT & T is a declaration by Ellen Reid, who is an employee of AT & T. Ms. Reid states that Mr. Cummings was enrolled in AT & T long distance service until February of 2002. Thus, because there is no evidence currently before the court that Mr. Cummings was an AT & T consumer at any time after March 1, 2002, the revised version of AT & T's consumer services agreement is not currently at issue.

**b. Scope of AT & T's Arbitration Clause**

 Plaintiff Cummings argues his antitrust, FCA § 202(a), New York consumer protection statute, and money had and received claims are based on conduct that occurred before AT & T implemented the arbitration clause effective August 1, 2001.[12] The scope of the arbitration agreement is as follows:

All ... disputes arising out of or related to *this Agreement* (whether based in contract, tort, statute, fraud, misrepresentation or any other legal or equitable theory) must be resolved by final and binding arbitration. This includes any dispute based on any product, service, or advertising having a connection with *this Agreement* ...

12. Mr. Cummings also argues that his FCA § 201(b) unjust and unreasonable claim and his breach of contract claim are not arbitrable insofar as they are based on conduct that occurred before AT & T's arbitration clause became effective on August 1, 2001. However, plaintiffs' second amended complaint only asserts FCA § 201(b) and breach of contract claims beginning August 1, 2001. Therefore, his arguments regarding the arbitrability of his pre-August 1, 2001, FCA § 201(b) and breach of contract claims are moot.

*Id.* § 7(a) (emphasis added). Unlike Sprint's arbitration clause, AT & T's arbitration clause does not automatically encompass all pre-existing disputes within the scope of the arbitration clause, but rather only encompasses claims that relate to or have a connection with "this Agreement," which is the CSA that went into effect on August 1, 2001.

Mr. Cummings' antitrust claim alleges that AT & T, Sprint, and MCI conspired to fix artificially high rates for their USF fund pass-through charges. His FCA § 202(a) claim alleges that AT & T unreasonably discriminated against its customers by overcharging its direct-dial long distance customers, in part to make up for the lack of USF fund pass-through charges on casual caller customers and direct-dial services that AT & T deems unbillable. His New York consumer protection statute claim alleges that AT & T deceived its customers by virtue of misrepresentations and omissions regarding the nature of its USF fund pass-through charges. His money had and received claim alleges that AT & T has retained millions of dollars in excess USF fees that should be returned to its customers. None of these claims "relate to" or have a "connection with" the CSA insofar as they involve USF fund pass-through charges prior to August 1, 2001. Therefore, the aspect of those claims that involve USF fund pass-through charges before August 1, 2001, do not fall within the scope of the arbitration clause.[13]

Also, Mr. Cummings' antitrust claim contains a separate component. It alleges that AT & T, Sprint, and MCI conspired to implement similar arbitration clauses. That claim relates to and has a connection with AT & T's CSA, which is a contract that implemented an arbitration clause that is allegedly the product of this antitrust conspiracy. Therefore, that aspect of his antitrust claim is arbitrable, regardless of whether it is based on conduct that occurred before or after August 1, 2001.

Mr. Cummings also argues that his antitrust claim is not arbitrable under *Coors.* As explained in Section I(B)(2)(b), *supra,* the Tenth Circuit's decision in *Coors* was a result of the scope of the arbitration clause at issue in that case. In this case, the court has construed the scope of the arbitration clause as set forth above, and *Coors* does not call for a different result solely by virtue of the nature of Mr. Cummings' antitrust claim.

**c. Collateral Estoppel Effect of Findings of Fact in *Ting***

■■■■ Plaintiffs ask the court to give preclusive effect to the findings of fact in *Ting.* "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *see also Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) ("When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."); *Harrison v. Eddy Potash, Inc.,* 248 F.3d 1014, 1022 (10th Cir.2001) ("Collateral estoppel ... means ... that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in

---

13. Section I of the CSA discusses charges, taxes, fees, and other surcharges, which would include (albeit implicitly) USF fund pass-through charges. Therefore, the claims discussed above fall within the scope of the arbitration clause insofar as they are based on USF fund pass-through charges after August 1, 2001.

any future lawsuit."). AT & T argues the *Ting* court's findings of fact should not be given preclusive effect because the legal standards in this case are different from those in *Ting* and because the district court's decision was on appeal.[14] The appeal process in *Ting* has now been exhausted, and therefore the court's decision in *Ting* is final. Thus, AT & T's only remaining argument against the application of collateral estoppel is that the legal standard in this case is different from that used by the court in *Ting*.

Because the court in *Ting* was exercising diversity jurisdiction, it is unclear whether this issue should be evaluated under federal or California state law. The Supreme Court has held that the claim-preclusive effect of a federal diversity judgment is a matter of federal law, but that this federal law is determined by applying "the law that would be applied by state courts in the State in which the federal diversity court sits." *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001). Here, however, the issue is one of collateral estoppel (*i.e.*, issue preclusion) rather than res judicata (*i.e.*, claim preclusion), and therefore the Supreme Court's holding in *Semtek* does not definitively resolve this issue. *Matosantos Commercial Corp. v. Applebee's Int'l, Inc.*, 245 F.3d 1203, 1207 (10th Cir.2001) (recognizing this distinction and declining to decide whether collateral estoppel should be evaluated using state law or federal law principles when the court in the initial case was exercising diversity jurisdiction). In any event, the court believes that the district court's findings of fact in *Ting* are entitled

to the same preclusive effect under both bodies of law.

California and federal law both require the issue to be precluded to be identical to the issue previously litigated. *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir.2000); *County of Riverside v. Superior Court*, 30 Cal.4th 278, 290, 132 Cal.Rptr.2d 713, 66 P.3d 718 (Cal.2003). The only issues in *Ting* and this court that are even arguably identical are the plaintiffs' procedural unconscionability challenges. Admittedly, these challenges were brought under California state law in *Ting* and under New York state law in this case, but the procedural unconscionability standards are nevertheless substantially similar and are dependent on the same types of facts, and thus they involve the same issue for collateral estoppel purposes. *See Raytech Corp. v. White*, 54 F.3d 187, 191 (3d Cir. 1995) (differences in the applicable legal standards must be substantial to defeat application of collateral estoppel; collecting case law on this issue); *Metromedia, Inc. v. Fugazy*, 983 F.2d 350, 365 (2d Cir.1992) (issues of fact are not identical for purposes of applying collateral estoppel if the legal standards are "significantly different"); *Wimsatt v. Beverly Hills Weight etc. Int'l, Inc.*, 32 Cal.App.4th 1511, 1517, 38 Cal.Rptr.2d 612 (1995) (identity of issues determination depends on whether the previous decision rests on the same factual and legal foundation).

However, *Ting* involved a frontal attack on the enforceability of a variety of provisions in AT & T's consumer services agreement, whereas here the court's inquiry much more narrowly focuses only on procedural unconscionability. Also,

---

**14.** AT & T does not argue that plaintiffs could have easily joined in the *Ting* action or that it would be unfair to AT & T to apply collateral estoppel to the district court's findings of fact in *Ting*. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (explaining that a plaintiff's wait-and-see attitude or considerations of unfairness to the defendant may warrant denying the offensive use of collateral estoppel).

many of the factual findings in *Ting* were specific to AT & T's California customers, and therefore do not conclusively establish relevant facts for purposes of AT & T's motion to compel arbitration of Mr. Cummings' claims, who is a Pennsylvania resident. Furthermore, plaintiff Cummings directs the court's attention to purported factual findings that are actually legal conclusions and mixed questions of law and fact. Thus, the issues in *Ting* and in this case are only identical in a few narrow respects.

In plaintiff Cummings' procedural unconscionability argument, he points to the following findings of fact in *Ting:*

1. The CSA is a contract of adhesion. *Ting v. AT & T,* 182 F.Supp.2d 902, 928 (N.D.Cal.2002), *aff'd in part, rev'd in part on other grounds,* 319 F.3d 1126 (9th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003). The court will not give this finding preclusive effect because it is a mixed question of law and fact.

2. Customers did not have a meaningful choice because nearly every major long distance telephone company requires arbitration on almost identical terms. *Id.* at 929. The court will not give this finding preclusive effect because it is a conclusion that rests on findings of fact regarding California customers. Specifically, the court noted that "[r]esidential long distance carriers who service two-thirds *of the California market* all provide substantially similar dispute resolution provisions which include mandatory arbitration." *Id.* at 929 (emphasis added); *see also id.* at 914 (discussing statistics of the California market in ¶¶ 37–41). By comparison, Mr. Cummings was an AT & T customer in Pennsylvania, and there is no record presently before the court regarding the presence and respective market shares of long distance carriers in Pennsylvania. Thus, the issues in *Ting* and this case are not identical in this respect.

3. When class members complained about the unfairness of the arbitration provisions, "AT & T representatives were instructed not to discuss arbitration, and class members would frequently be directed to a recording or written materials. A class member who specifically complained about the arbitration provision would be sent a written response which stated in part that 'all of the other major long distance carriers have included an arbitration provision in their service agreements.' " *Id.* at 929. The court will not give this factual finding preclusive effect because it is irrelevant. The factual finding in *Ting* pertains to what AT & T told the class member plaintiffs in *Ting,* not any interaction between AT & T and Mr. Cummings. Thus, the issues in *Ting* and this case are not identical in this respect.

4. "The CSA possessed the 'surprise' necessary for a finding of procedural unconscionability." *Id.* at 929. The court will not give this finding preclusive effect because it is a mixed question of law and fact.

 The two other factual findings that Mr. Cummings asks the court to collaterally estop AT & T from relitigating in the context of procedural unconscionability are:

1. AT & T had superior bargaining strength and presented the CSA to its residential customers as a preprinted document with uniform language on a take-it-or-leave-it basis. *Id.* at 928.

2. AT & T presented the CSA to its residential customers as a non-event that "made customers less alert to the fact that they were being asked to give up important legal rights and remedies." *Id.* at 912.

With respect to these two findings, there is a sufficient identity of issues between *Ting* and this case, and therefore the court will give these two findings preclusive effect in evaluating the procedural unconscionability of the arbitration clause.

### d. Procedural Unconscionability of the Arbitration Clause[15]

 "The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice." *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10–11, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1989). This is judged by inequality of bargaining power and whether the party seeking to enforce the contract used high-pressure tactics, deceptive language, or fine print, as well as the experience and education of the party claiming unconscionability. *Sablosky v. Edward S. Gordon Co., Inc.*, 73 N.Y.2d 133, 139, 538 N.Y.S.2d 513, 535 N.E.2d 643 (N.Y.1989); *Gillman*, 73 N.Y.2d at 11, 537 N.Y.S.2d 787, 534 N.E.2d 824.

AT & T had superior bargaining strength and presented the CSA to its residential customers as a pre-printed document with uniform language on a take-it-or-leave-it basis. *Ting*, 182 F.Supp.2d at 928. Further, AT & T presented the CSA to its residential customers as a non-event that "made customers less alert to the fact that they were being asked to give up important legal rights and remedies." *Id.* at 913. However, AT & T notably pointed this provision out to its residential customers in the third paragraph of its May 2001 cover letter, which is in the top half of the page, *before* the statement in the letter informing customers that they need not do anything else in order to continue their service with AT & T. The FAQ sheet listed the binding arbitration clause as the first "notable" change, *before* the other "notable" change regarding the manner in which customers would be notified of price increases. Further, the dispute resolution provision began, **"IT IS IMPORTANT THAT YOU READ THIS ENTIRE SECTION CAREFULLY"** (emphasis in original). Then, it set forth various important aspects of the dispute resolution provision in bold all-capital lettering. Mr. Cummings had ample time to review AT & T's mailing, whether he chose to do so or not, and to cancel his service with AT & T if he did not wish to be bound by the arbitration clause. Moreover, AT & T is selling a fungible product in a competitive market, and there is no evidence in the record that Mr. Cummings could not have purchased this same fungible product from another long distance carrier who, unlike AT & T, Sprint, and MCI, did not require its customers to arbitrate disputes. Thus, Mr. Cummings has failed to demonstrate the absence of a meaningful choice. Accordingly, the court is unpersuaded that AT & T's arbitration clause should not be enforced because of procedural unconscionability.

### e. Effective Forum to Vindicate Statutory Rights

Mr. Cummings also argues that AT & T's arbitration clause does not provide him with an effective forum to vindicate his statutory rights under the antitrust laws and the FCA because the agreement bans:

---

**15.** The parties agree that the choice-of-law provision requires the court to apply the FAA along with New York law.

(1) treble damages, (2) attorneys' fee awards, and (3) class actions.

 Despite Mr. Cummings' argument regarding the ban on treble damages, AT & T's CSA does not speak precisely to the issue of treble damages. Rather, it states that AT & T shall not be liable for "punitive, reliance or special damages." Whether this provision actually bans an award of treble damages is disputable, and therefore must be resolved by an arbitrator in the first instance. *PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 123 S.Ct. 1531, 1535–36, 155 L.Ed.2d 578 (2003).

Further, the agreement does not ban attorneys' fees. Rather, it provides: *"Unless applicable substantive law provides otherwise,* each party will pay its own expenses to participate in the arbitration, including attorneys' fees and expenses for witnesses, document production, and presentation of evidence" (emphasis added). Thus, this provision allows Mr. Cummings to recover attorneys' fees to the same extent that he would be permitted to do so in a court of law.

 Mr. Cummings correctly argues that the agreement by its plain terms bans class actions as well as arbitration on a class-wide basis.[16] "Having made the bargain to arbitrate, [plaintiff] should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Such Congressional intent may be found in the text, legislative history, or in an "inherent conflict" between arbitration and the statute's underlying purposes. *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (citing *Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 227, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)). The burden of establishing that Congress meant to preclude arbitration for a statutory claim rests with the party who seeks to avoid arbitration. *Id.*

Mr. Cummings has failed his burden of proving that anything in the text or legislative history of the Sherman Act, the Clayton Act, or the FCA indicates that Congress intended to grant plaintiffs a non-waivable statutory right to pursue claims under those statutes on a class-wide basis. Further, he has advanced no persuasive argument that there is an irreconcilable conflict between a ban on class actions and the substantive rights provided by those statutes. Congress already provided ample statutory incentives for plaintiffs to vindicate their rights under those statutes by, for example, being able to recover treble damage and attorneys' fees, and also by allowing administrative agencies to pursue enforcement actions. Those statutes notably do not provide any mechanism for plaintiffs to bring class actions. Rather, class actions under those statutes are a creature of the federal courts' procedural rules. *See generally* Fed.R.Civ.P. 23 (providing the class action mechanism). Mr. Cummings' "inability to bring a class action ... cannot by itself suffice to defeat the strong congressional preference for an arbitral forum." *Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 503 (4th Cir.2002) (holding claims under the Fair Labor Standards

---

**16.** As discussed in Section I(B)(2)(d), *supra,* the Supreme Court's opinion in *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), involved the issue of whether the court or an arbitrator must decide whether class-wide arbitration is available when the arbitration agreement is silent on that issue. Under such circum-

stances, the availability of class-wide arbitration is disputable, and hence that dispute must be decided in the first instance by the arbitrator. Here, however, the arbitration clause clearly forbids class-wide arbitration. Thus, the court must determine whether that prohibition effectively prevents Mr. Cummings from vindicating his statutory rights.

Act are arbitrable even if the plaintiff is unable to bring a class action). Accordingly, the court will enforce the parties' arbitration agreement precisely as it is written. *See, e.g., Livingston v. Assocs. Fin., Inc.,* 339 F.3d 553 (7th Cir.2003) (enforcing an arbitration agreement prohibiting class actions where Truth in Lending Act claims were involved); *Randolph v. Green Tree Fin. Corp.—Ala.,* 244 F.3d 814 (11th Cir. 2001) (same); *Johnson v. W. Suburban Bank,* 225 F.3d 366, 377 (3d Cir.2000) (same).

Mr. Cummings also argues that arbitration is prohibitively expensive. Like the Sprint plaintiffs, he originally argued that this consideration rendered the arbitration clause substantively unconscionable, not that it made arbitration an ineffective forum to vindicate his statutory rights. However, out of an abundance of caution, the court will consider this argument in evaluating whether arbitration provides him with an effective forum to vindicate his statutory rights. As explained above in Section I(B)(2)(d), *supra,* Mr. Cummings bears the burden of proving that arbitration will be prohibitively expensive.

Based on the nature of the allegations in this case, it appears to the court that Mr. Cummings' claims may very well be worth less than $1,000. The arbitration clause provides that for claims of less than $1,000, Mr. Cummings is only obligated to pay a $20 filing fee and AT & T will pay all of the AAA's other costs and fees for a document (*i.e.,* desk) arbitration. If Mr. Cummings elects an arbitration process other than a desk arbitration, he must pay his share of fees and costs. The provision also states that the "prevailing party may ... seek to recover the AAA's fees and expenses of the arbitrator from the other party." As was the case with Sprint's arbitration clause, the court can envision that this provision could theoretically impose prohibitive costs on Mr. Cummings,

particularly if a desk arbitration is not a feasible procedure for resolving his claims against AT & T. However, Mr. Cummings, like the Sprint plaintiffs, has offered absolutely no evidence to support his claim that the costs of arbitration will deny him an effective forum to vindicate his statutory rights. Thus, under *Green Tree,* he has failed in his burden of proof on this issue and the court must compel arbitration of his statutory claims.

### 4. Enforceability of Arbitration Clauses Against Non–Customers

Lastly, defendants argue that the court should compel arbitration of all of the plaintiffs' antitrust claims. In other words, AT & T asks the court to also compel arbitration of the antitrust claims against AT & T by plaintiffs who are Sprint and MCI customers, and Sprint asks the court to also compel arbitration of the antitrust claims against Sprint by plaintiffs who are AT & T and MCI customers. Of course, no arbitration agreement exists between AT & T and the customers of Sprint and MCI, nor does an arbitration agreement exist between Sprint and the customers of AT & T and MCI. Defendants urge the court to apply equitable estoppel principles to compel arbitration of these claims.

"Historically, equitable estoppel has been used to prevent a party from taking a legal position inconsistent with an earlier statement or action that places his adversary at a disadvantage." *Penny v. Giuffrida,* 897 F.2d 1543, 1545 (10th Cir.1990); *see also Spaulding v. United Transp. Union,* 279 F.3d 901, 909 (10th Cir.2002) (equitable estoppel prevents a party from taking a position that is inconsistent with other action that places its adversary at a disadvantage); *Kowalczyk v. I.N.S.,* 245 F.3d 1143, 1149 (10th Cir.2001) (same). The Tenth Circuit has not yet been con-

fronted with the issue of whether equitable estoppel principles can be used to compel arbitration. However, other circuits have employed these principles, and hence the court will look to cases from these other circuits to evaluate this issue.

One theory adopted by these other circuits is the direct benefits theory. This theory allows a non-signatory to be held to an arbitration clause when the non-signatory knowingly exploits the contract and then, during litigation, attempts to repudiate the arbitration clause in the contract. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 200 (3d Cir.2001); *Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 778 (2d Cir.1995). This theory is intended to prevent a non-signatory from embracing a contract, then turning its back on other portions of the contract that it finds distasteful, such as an arbitration clause. *See, e.g., Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999) (binding a non-signatory to an arbitration clause where the non-signatory received direct benefits under the contract). Under this theory, plaintiffs would be the non-signatories who defendants are seeking to estop from repudiating the arbitration clauses contained in the service contracts of the other long distance carriers—that is, carriers other than their own long distance carriers. However, plaintiffs have not received any benefits from those other long distance carriers' service contracts. Thus, there is nothing inconsistent or inequitable about not requiring them to be bound by the arbitration clauses in those other carriers' service contracts. In short, this equitable estoppel theory does not apply here.

The other theory of equitable estoppel in the arbitration context, and the one that defendants urge this court to apply, is the "intertwined claims" theory. This theory applies to prevent "a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement the estopped party has signed." *Thomson–CSF, S.A.,* 64 F.3d at 779 (emphasis added). This theory applies "when the party ordered to arbitrate has agreed to arbitrate disputes arising out of a contract and is suing in reliance upon that contract." *Westmoreland v. Sadoux,* 299 F.3d 462, 465 (5th Cir.2002); *see also, e.g., Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 531 (5th Cir.2000) (upholding the use of equitable estoppel to compel arbitration where the claims were "intertwined with, and dependent upon" the agreement containing a broad arbitration clause). It is premised on the notion that a party cannot " 'have it both ways': it cannot seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Grigson,* 210 F.3d at 528. This can occur when the signatory to the contract containing the arbitration clause alleges "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir.1999) (quotation omitted); *accord Grigson,* 210 F.3d at 527.

Here, plaintiffs, who are signatories to their service contracts with their own long distance carriers, allege substantially interdependent and concerted misconduct among AT & T, Sprint, and MCI. They allege that AT & T, Sprint, and MCI conspired to fix artificially high and non-competitive USF fund pass-through rates and to implement similar dispute resolution clauses requiring their customers to arbitrate all disputes in an effort to shield themselves from liability for their wrongful conduct. Further, their contracts with

their customers are the means by which they implemented this alleged conspiracy. Plaintiffs are essentially attempting to "have it both ways." On the one hand, plaintiffs want to rely on the terms of their service contracts to claim that AT & T, Sprint, and MCI have conspired against them. But then, on the other hand, they do not want to be bound by the arbitration clauses in their service contracts despite the fact that those service contracts are the basis for their antitrust claims. If the court does not compel arbitration of all of the plaintiffs' claims under the terms of the respective arbitration clauses, the arbitration proceedings between the signatories to the service contracts (*i.e.*, plaintiffs Thome, Bryan, and Tiffany's antitrust claim against Sprint, and plaintiff Cummings' antitrust claim against AT & T) will "be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir.1976); *see, e.g., Grigson*, 210 F.3d at 527–31 (affirming the district court's ruling compelling arbitration of the plaintiff signatory's claims against non-signatory defendants where the defendants were "charged with interdependent and concerted misconduct" with a signatory); *MS Dealer Serv. Corp.*, 177 F.3d at 947–48 (compelling arbitration of the plaintiff signatory's claims against non-signatory defendants where those non-signatory defendants worked hand-in-hand with a signatory defendant to engage in a fraudulent scheme).[17]

Thus, notions of equity and fairness require the court to compel arbitration of plaintiffs' antitrust claims against the long distance carriers other than their own under the terms of those plaintiffs' arbitration clauses with their respective long distance carriers. As discussed in Section I(B)(2), *supra*, plaintiffs Thome, Bryan, and Tiffany's antitrust claims against Sprint are fully arbitrable, and therefore those plaintiffs' antitrust claims against AT & T are also fully arbitrable. As discussed in Section I(B)(3), *supra*, plaintiff Cummings' antitrust claim against AT & T is arbitrable insofar as it is based on USF fund pass-through charges beginning August 1, 2001, and insofar as it involves the arbitration clause. Therefore, his claims against Sprint are arbitrable to that same extent.

MCI's service contract with its residential customers that went into effect on August 1, 2001,[18] provides for mandatory arbitration of "[a]ny dispute arising out of or related to this Agreement or [MCI]'s products or services ... regardless as to whether the dispute is based in contract, tort, statute, fraud, misrepresentation, or any other legal or equitable theory." This arbitration clause certainly encompasses MCI's residential customers' antitrust claims. Further, the clause is not just limited to disputes arising out of or relating to the service contract. Rather, it

---

17. The court is also mindful of the Eleventh Circuit's holding in *In re Humana Inc. Managed Care Litigation*, 285 F.3d 971 (11th Cir. 2002), *rev'd on other grounds, PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003), in which the Eleventh Circuit affirmed the district court's rejection of the use of this equitable estoppel principle where the complaint alleged a RICO conspiracy. The Eleventh Circuit explained that the plaintiffs "make no suggestion that the contracts containing the arbitration clauses are themselves the product of, or in any way related to, the HMO's conspiratorial behavior." *Id.* at 976. This case is distinguishable because here the arbitration clauses at issue are a product of the alleged conspiratorial behavior among AT & T, Sprint, and MCI.

18. Plaintiffs who are or were MCI customers do not argue that this arbitration clause is unenforceable.

more broadly extends to disputes arising out of or related to MCI's products or services. Thus, this clause does not require that the claim have a nexus to the service agreement, and instead by its plain terms includes disputes that pre-date the agreement. MCI's residential customers' antitrust claim against MCI would be fully arbitrable, and therefore those plaintiffs' antitrust claims against AT & T and Sprint are also fully arbitrable.

In sum, the court will compel arbitration under equitable estoppel principles of plaintiffs' antitrust claims against long distance carriers other than their own, except that the court will not compel plaintiff Cummings to arbitrate his antitrust claim against Sprint insofar as that claim is based on USF fund pass-through charges prior to August 1, 2001.

## II. DEFENDANTS' MOTIONS TO DISMISS[19]

Defendants ask the court to dismiss plaintiffs' complaint in its entirety. Defendants argue plaintiffs' pre-August 1, 2001 (*i.e.*, pre-detariffing) claims are barred by the filed-rate doctrine, and that plaintiffs' claims beginning August 1, 2001 (*i.e.*, post-detariffing) are preempted by the FCA. Defendants also argue that many of plaintiffs' claims do not contain sufficient allegations to withstand a motion to dismiss for failure to state a claim upon which relief can be granted.

## A. Legal Standard for a Motion to Dismiss

The court will dismiss a cause of action for failure to state a claim only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief," *Poole v. County of Otero*, 271 F.3d 955, 957 (10th Cir.2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), or when an issue of law is dispositive, *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir.2001). The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quotation omitted).

## B. Discussion & Analysis

For the reasons explained below, plaintiffs' declaratory judgment claim is dismissed. Further, plaintiffs' pre-detariffing antitrust, state law consumer protection, and money had and received claims are barred by the filed-rate doctrine. Plaintiffs' post-detariffing money had and received claim is preempted by the FCA. Also, the AT & T plaintiffs' have failed to state a claim upon which relief can be granted under the New York consumer protection statute.

Plaintiffs, however, have adequately stated claims upon which relief can be granted with respect to: (1) plaintiffs' antitrust claim insofar as it is based on post-detariffing USF fund pass-through charges and defendants' implementation of similar dispute resolution and limitation of

---

19. Defendants filed their motions to dismiss on October 16, 2002. Since then, plaintiffs filed a second amended complaint on March 10, 2003 (Doc. 148). AT & T and Sprint's arguments regarding plaintiffs' claims under New Jersey laws and for common law fraud, injunctive relief, and punitive damage are now moot because plaintiffs' second amended complaint dropped those claims.

liability provisions; (2) plaintiffs' FCA § 201(b) unjust and unreasonable claim; (3) the AT & T plaintiffs' FCA § 202(a) discrimination claim; (4) the Sprint plaintiffs' post-detariffing claim under the KCPA; and (5) plaintiffs' breach of contract claim.

### 1. Plaintiffs' Declaratory Judgment Claim

In plaintiffs' declaratory judgment claim, plaintiffs Thome, Bryan, Tiffany, Cummings, and Gest seek a declaratory judgment that the arbitration and limitation of liability provisions in their service contracts are "illusory, illegal, unconscionable, against public policy or otherwise unenforceable." Defendants ask the court to dismiss this claim on the basis that the arbitration clauses are enforceable and that the enforceability of the limitation of liability provisions are issues for the arbitrator to decide. For the reasons explained in Section I(B) above, the court agrees. Accordingly, defendants motions to dismiss are granted with respect to plaintiffs' declaratory judgment claim.[20]

### 2. Plaintiffs' Pre–Detariffing Claims: The Filed–Rate Doctrine[21]

■ Section 203 of the FCA requires all common carriers to file with the FCC "schedules" (*i.e.*, tariffs) "showing all charges ... and showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). Carriers may not "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting

such charges, except as specified" in those filed tariffs. *Id.* § 203(c). These provisions are designed to ensure that all purchasers of communications services receive the same federally regulated rates. *MCI Telecommunications Corp. v. AT & T Co.*, 512 U.S. 218, 230, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).

The Supreme Court has interpreted these provisions to create the filed-rate doctrine, which holds that "the rate of the carrier duly filed is the only lawful charge" and that "[d]eviation from it is not permitted upon any pretext." *AT & T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (quotation and citation omitted; bracket in original). Under this rule, "charges" as well as "the classifications, practices, and regulation affecting such charges," 47 U.S.C. § 203(a), filed with the FCC "bind both carriers and [customers] with the force of law." *Lowden v. Simonds–Shields–Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939). The rights and liabilities defined by the tariff "cannot be varied or enlarged by either contract or tort of the carrier." *Cent. Office*, 524 U.S. at 227, 118 S.Ct. 1956. Accordingly, the filed-rate doctrine bars state law claims that directly pertain to the price of telecommunications services as well as non-price aspects, such as "service, provisioning, and billing options." *Id.* at 220, 118 S.Ct. 1956.

■ Here, plaintiffs' antitrust claim alleges that defendants conspired to fix artificially high USF fund pass-through rates and to implement similar arbitration provi-

---

**20.** The court recognizes that its ruling on defendants' motion to compel arbitration did not address the enforceability of the arbitration provision with respect to Mr. Gest. However, as explained in footnote 3, *supra*, Mr. Gest has agreed to be bound by the court's holding with respect to the arbitrability of Mr. Cummings' claims. If the court has misun-

derstood the parties' positions in this regard, the court anticipates the parties will file a motion to reconsider this issue.

**21.** Plaintiffs' pre-detariffing claims include plaintiffs' antitrust, FCA § 202 discrimination, consumer protection, and money had and received claims.

sions. Defendants' tariffs specifically set forth the USF fund pass-through rates, and Sprint's tariff that went into effect on July 1, 2001, contained an arbitration clause. Plaintiffs' antitrust claim essentially challenges the validity of these terms of the tariffs because they are the product of an alleged improper conspiracy. The filed-rate doctrine bars precisely this type of claim because the rates, terms, and conditions set forth in the tariff are deemed to be the *only* lawful rates, terms, and conditions. Plaintiffs and defendants are both bound by the tariff and may not deviate from it. Thus, plaintiffs' pre-detariffing antitrust claims are barred by the filed-rate doctrine. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) (holding the filed-rate doctrine bars antitrust damage claims even if the carriers colluded to set artificially high rates); *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (holding the filed-rate doctrine bars antitrust damage claims).

■ Similarly, plaintiffs' New York consumer protection statute and KCPA claims allege that defendants misrepresented the nature of the USF fund surcharges on invoices to their customers. Again, these allegations presume that plaintiffs are entitled to some other USF fund surcharge rate. Even if defendants did misrepresent the nature of the rate, plaintiffs do not allege that defendants charged plaintiffs a USF fund pass-through rate different than the one set forth in defendants' tariffs. Therefore, plaintiffs' pre-detariffing state law consumer protection claims are barred by the filed-rate doc-

trine. *See Evanns v. AT&T Corp.*, 229 F.3d 837, 839–41 (9th Cir.2000) (holding the filed-rate doctrine barred the plaintiffs' state law claims challenging AT & T's USF fund pass-through rates); *Marcus v. AT&T Corp.*, 138 F.3d 46, 62 (2d Cir.1998) (holding the filed rate doctrine barred a state law claim for damages under the New York consumer protection statute). Plaintiffs cannot claim that they suffered any legally cognizable injury or were aggrieved by virtue of defendants' alleged deception because plaintiffs were legally required to pay the tariff rate. *See Marcus*, 138 F.3d at 63–64 (explaining this in the context of the New York consumer protection statute); *Stein v. Sprint Corp.*, 22 F.Supp.2d 1210, 1214 (D.Kan.1998) (same, under the KCPA).[22]

■ Plaintiffs' money had and received claim seeks to recover USF fund pass-through charges that plaintiffs allegedly overpaid. This claim presumes that plaintiffs were entitled to pay lower USF surcharges than they actually paid. Again, this claim is barred by the filed-rate doctrine, under which the only lawful USF surcharge rate was the one set forth in defendants' tariffs. Plaintiffs and defendants were bound by this surcharge rate, regardless of whether defendants' USF rates were legitimate or if they did overcharge plaintiffs and use their USF surcharges as secret profit centers.

■ However, the AT & T plaintiffs' FCA § 202(a) discrimination claim is not barred by, nor implicated by, the filed-rate doctrine. This claim alleges that AT & T unreasonably discriminated in the manner

---

**22.** In addition, these consumer protection statute claims are barred by the filed-rate doctrine for yet another reason. The filed-rate doctrine presumes that customers have knowledge of the rates, terms, and conditions in the tariffs. *See Ting v. AT&T*, 319 F.3d 1126, 1131 (9th Cir.) (filed-rate doctrine presumes customers have knowledge of the filed rate), *cert. denied*, —— U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003); *Marcus*, 138 F.3d at 63 (same). Therefore, plaintiffs could not have reasonably relied on any alleged misrepresentations of defendants.

in which it imposed its USF fund pass-through charges. This is the proper remedy for challenging the propriety of the rates, terms, and conditions of service set forth in defendants' tariffs. *Cent. Office,* 524 U.S. at 226, 118 S.Ct. 1956 ("To the extent respondent is asserting discriminatory treatment, its remedy is to bring suit under § 202 of the [FCA]."); *see also* 47 U.S.C. §§ 206, 207 (providing a private right of action in federal district court for damages for a carrier's violation of the FCA).

The court rejects plaintiffs' argument that the filed-rate doctrine does not apply because the FCC did not provide a substantive comprehensive regulatory scheme. Plaintiffs argue the FCC had streamlined the process of filing tariffs so significantly that it had become essentially ministerial in nature. However, the rates established in tariffs need not undergo formal hearings in order to be properly regarded as filed rates; rather, they must simply be "duly submitted, lawful rates," *Square D. Co.,* 476 U.S. at 417, 106 S.Ct. 1922, under the act in question—in this case, the FCA. *Compare id.* (applying the filed-rate doctrine where the carrier had filed its rates in accordance with the Interstate Commerce Act), *with Carnation Co. v. Pac. Westbound Conference,* 383 U.S. 213, 215, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) (declining to apply the filed-rate doctrine because the ratemaking agreement was required to be, but had not been, approved by the Federal Maritime Commission).

Lastly, plaintiffs argue that the filed-rate doctrine does not apply to claims for injunctive relief. While this might be true, *see Square D,* 476 U.S. at 422, 106 S.Ct. 1922 (observing that the filed-rate doctrine does not make regulated entities immune from criminal sanctions and equitable relief under the antitrust laws); *Marcus,* 138 F.3d at 62 (reasoning that the filed-rate doctrine prevents a suit for damages because it implicates discrimination in pricing, and a suit for injunctive relief appears not to interfere with this nondiscrimination policy), any injunctive relief would apply prospectively. Therefore, the potential availability of injunctive relief does not implicate any tariffs currently on file with the FCC at this late date, which is more than two years after the FCC implemented mandatory detariffing.[23]

In sum, defendants' motions to dismiss are granted on the basis of the filed-rate doctrine with respect to plaintiffs' pre-detariffing antitrust, New York consumer protection statute, KCPA, and money had and received claims. However, defendants' motion to dismiss plaintiffs' FCA § 202(a) discrimination claim on the basis of the filed-rate doctrine is denied.

### 3. Plaintiffs' Post–Detariffing Claims: FCA Preemption[24]

█ For the reasons explained in Section I(B)(1), *supra,* the FCA preempts plaintiffs' state law challenges to the propriety of defendants' rates, terms, and con-

---

**23.** Plaintiffs also argue the filed rate doctrine does not apply to Sprint's wireless services. Sprint correctly points out that the complaint does not allege that any of the plaintiffs are or were Sprint wireless customers. Therefore, this argument is moot.

**24.** Defendants' argument that the filed-rate doctrine survived detariffing is untenable. The filed-rate doctrine, "by definition, did not survive detariffing." *Ting v. AT&T,* 319 F.3d 1126, 1139 (9th Cir.2003). Indeed, the FCC

elected to implement mandatory detariffing, rather than permissive detariffing, precisely because it wished to eliminate carriers' "possible invocation of the 'filed-rate' doctrine." *Second Report & Order, supra,* ¶ 60, at 20,765–20,766, 1996 WL 633345; *accord Order on Reconsideration, supra,* ¶ 3, at 15,017; *see MCI WorldCom,* 209 F.3d at 764–65 (explaining that the FCC rejected the alternative of permissive detariffing because it wanted to "disentangle the [long-distance] carriers' prices from the filed-rate doctrine").

ditions of service. Plaintiffs' only vehicle to raise such a challenge is to bring a claim under the FCA alleging that the carrier's rates, terms, and conditions of service are unjust, unreasonable, and/or discriminatory. However, the FCA does not preempt claims involving the manner in which carriers implement or fail to adhere to their own rates, terms, and conditions of service. Therefore, the court must examine the nature of each of plaintiffs' claims to determine whether those claims are preempted by the FCA.

■ Plaintiffs' antitrust claim does, to some degree, challenge the propriety of defendants' USF fund pass-through rates. However, the thrust of this claim is predominantly an objection to the manner in which defendants determined that they would implement these rates as well as the dispute resolution and limitation of liability provisions. Thus, this claim is more akin to a contract formation issue than a direct challenge to the rates, terms, and conditions of service. *See Order on Reconsideration, supra,* ¶ 77, at 15,057, 1997 WL 473330 ("[T]he Communication Acts does not govern other issues, such as *contract formation* . . . that arise in a detariffed environment" (emphasis added)). Accordingly, this claim is not preempted by the FCA.

Plaintiffs' claims that defendants administered their USF fund pass-through charges in an unjust, unreasonable, and discriminatory manner are brought pursuant to §§ 201(b) and 202(a) of the FCA. The FCA certainly does not preempt itself. Therefore, these claims are not preempted by the FCA.

■ The AT & T plaintiffs' claims under the New York consumer protection statute and the Sprint plaintiffs' claims under the KCPA focus on defendants' deceptive conduct, not on the propriety of defendants' rates, terms, and conditions of service. Indeed, the FCC specifically an-

ticipated that these types of claims would no longer be barred by federal law. *See id.* ("As stated in the *Second Report and Order,* consumers may have remedies under *state consumer protection . . . laws* as to issues regarding the legal relationship between the carrier and customer in a detariffed regime" (emphasis added).). Therefore, these claims are not preempted by the FCA.

■ The gist of plaintiffs' claim for money had and received "is that defendant has received money which, in equity and good conscience, should have been paid to plaintiff and under such circumstances that he ought to pay it over." Black's Law Dictionary 1005 (6th ed.1990). "This action is founded upon the principle that a person should not be unjustly enriched at the expense of another." *Ryan v. Spaniol,* 193 F.2d 551, 553 (10th Cir.1951). It "derives from the contract principles of implied contract and restitution, which require that a benefit have been conferred for a plaintiff to recover, and also from the equitable principle that one may not be unjustly enriched at the expense of another." *Epps Aircraft, Inc. v. Exxon Corp.,* 859 F.Supp. 533, 535 (M.D.Ala.1993); *see also* Restatement (Second) of Contracts, ch. 16, topic 4, introductory note (1981) ("Restitution . . . has its objective . . . [as] the prevention of unjust enrichment. . . ."). Thus, plaintiffs' claim for money had and received is premised on the notion that there is something unjust about defendants retaining the USF fund pass-through monies they collected from their customers. As such, this type of claim falls precisely within the purview of § 201(a) of the FCA, which is the exclusive mechanism for determining whether the terms of defendants' service contracts are unjust and unreasonable. Accordingly, plaintiffs' claim for money had and received is preempted by the FCA.

■ Plaintiffs' breach of contract claim is not a direct challenge to the propriety of defendants' rates, terms, and conditions of service. Rather, it is a claim that defendants failed to adhere to their rates, terms, and conditions of service. Like plaintiffs' consumer protection act claims, the FCC specifically anticipated that such breach of contract claims would no longer be barred by federal law. *See Order on Reconsideration, supra,* ¶ 77 at 15,057, 1997 WL 473330 ("The Communications Act does not govern other issues, such as … *breach of contract,* that arise in a detariffed environment" (emphasis added)). Therefore, this claim is not preempted by the FCA.

In sum, defendants' motions to dismiss are granted with respect to plaintiffs' post-detariffing money had and received claim on the basis that the FCA preempts those claims. However, defendants' motions to dismiss plaintiffs' post-detariffing antitrust, FCA §§ 201(b) and 202(a), state law consumer protection, and breach of contract claims on the basis of FCA preemption are denied.

#### 4. Defendants' Additional Challenges to the Remaining Claims

Defendants' also argue that, aside from the filed-rate doctrine and FCA preemption considerations, plaintiffs' complaint fails to state a claim upon which relief can be granted with respect to plaintiffs' antitrust, FCA § 202(a), consumer protection, and breach of contract claims.

#### a. Antitrust Claim

■ Section 1 of the Sherman Act prohibits "every contract, combination … or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. In order to state a horizontal price-fixing claim, plaintiffs must allege, among other things, "the existence of an agreement, combination or conspiracy." *Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357,

1361 (10th Cir.1989). Direct evidence of such an agreement is often difficult if not impossible to obtain, and therefore an illegal agreement may be established through circumstantial evidence. *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *Cayman,* 873 F.2d at 1361. "While consciously parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove conspiracy." *Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 859 (10th Cir.1999); *see also Cayman,* 873 F.2d at 1361 ("[C]onscious parallel business behavior, standing alone, is insufficient to prove conspiracy."). Parallel behavior may, however, suggest that an illegal agreement exists when accompanied by a so-called "plus factor"— that is "additional evidence from which an understanding among the parties may be inferred." *Id.* (quotation omitted).

■ Defendants contend that, because plaintiffs rely on the arguable parallelism of defendants' USF fund pass-through rates, plaintiffs must allege parallel conduct as well as plus factors in order to state a claim upon which relief may be granted. While plaintiffs acknowledge that they will eventually be required to establish parallel conduct and plus factors sufficient to support an inference that an agreement to conspire existed, plaintiffs argue that they are not required to allege such facts at the pleading stage. The court disagrees.

In *Cayman Exploration,* the Tenth Circuit affirmed the district court's Rule 12(b)(6) dismissal of the plaintiff's antitrust claim. In doing so, the court noted that "[t]he antitrust plaintiff who relies on a theory of conscious parallelism must establish that defendants engaged in consciously parallel action … which was contrary to their economic self-interest so as not to amount to good faith business judgment."

873 F.2d at 1361 (internal quotations omitted). The court affirmed the district court's dismissal of the plaintiff's horizontal price-fixing claim because the plaintiff "did not identify the alleged conspirators, when or how they functioned, or the nature and extent of [the defendant]'s participation in the alleged conspiracy." *Id.* Moreover, the plaintiff failed to allege any facts to support an inference that the alleged actions would be contrary to their economic interests absent an agreement. *Id.* The court is unconvinced that the contrary-to-economic-interests inquiry is still the only factor that can support an antitrust conspiracy claim. *See, e.g., Mitchael,* 179 F.3d at 858–59 (holding consciously parallel behavior may indicate the existence of an illegal agreement when augmented with additional evidence from which an understanding among the parties may be inferred). However, implicit in the Tenth Circuit's reasoning in *Cayman Exploration* is that in order to survive a Rule 12(b)(6) motion a plaintiff alleging price-fixing must *plead* parallel conduct and additional evidence (*i.e.,* a plus factor) sufficient to give rise to an inference that the conspirators' conduct was interdependent. *See also, e.g., Twombly v. Bell Atl. Corp.,* No. 02 Civ. 10220(GEL), 2003 WL 22304824, at *4–*6 (S.D.N.Y. Oct.8, 2003) (collecting case law, thoroughly considering this issue in the context of a Rule 12(b)(6) motion to dismiss, and concluding that a plaintiff proceeding on a theory of conscious parallelism must also allege a plus factor).

Defendants argue that plaintiffs have not alleged parallel pricing because the allegations in plaintiffs' complaint reveal that AT & T, Sprint, and MCI did not implement identical USF surcharge rates. However, conscious parallelism refers to a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracom-

petitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). This theory can, but need not necessarily, rest on parallel pricing. Rather, it depends upon whether the alleged conspirators engaged in "parallel *business behavior.*" *Theatre Enters.,* 346 U.S. at 541, 74 S.Ct. 257 (emphasis added; holding the existence of an antitrust conspiracy restricting first run movies to downtown theaters was a question for the jury); *see also Mitchael,* 179 F.3d at 859 (discussing this theory with respect to parallel behavior, not parallel pricing).

Here, plaintiffs have alleged sufficiently parallel business behavior. The complaint alleges that AT & T, Sprint, and MCI all conspired to artificially inflate their USF fund pass-through charges in order to create secret profit centers and to nearly simultaneously implement similar dispute resolution and limitation of liability provisions in an attempt to shield themselves from liability for their wrongful conduct. Plaintiffs notably allege that none of these carriers were required to pass through their USF contributions to their customers, yet all of them coincidentally chose to do so. In the first quarter of 2000, they implemented similar USF surcharges on their residential customers of 8.6%, 8.3%, and 8.4%, all of which were approximately 150% of the 5.71% USF contribution factor for that quarter. Then, except for a few random surges, they generally maintained USF surcharge rates for their residential customers at roughly 3% above the USF contribution factor. While admittedly there does not appear to be much uniformity with respect to their business customer USF surcharge rates, the business customer surcharge rates nevertheless remained well above the USF contribution

factor. When these carriers were confronted with the somewhat unpredictable impacts of the then-upcoming detariffing, they almost [25] simultaneously implemented similar dispute resolution and limitation of liability provisions, allegedly in an attempt to shield themselves from liability from (perhaps among other things) the fact that they had been using their USF surcharges as secret profit centers.

In addition, plaintiffs have alleged sufficient plus factors to support an inference of conspiracy. Most notably, plaintiffs allege that Sprint, AT & T, and MCI implemented nearly identical dispute resolution and limitation of liability provisions in an attempt to shield themselves from liability for their wrongful conduct. Plaintiffs' complaint refers to internal AT & T e-mails stating "it would help to know ... [w]hat our friends at MCI and Sprint are planning" in response to detariffing. Second Am. Compl. ¶ 89, at 29. Plaintiffs' complaint also alleges that the AT & T executive responsible for developing and implementing AT & T's response to detariffing testified in a deposition that these provisions resulted from "discussions" between AT & T and "some attorneys from MCI and Sprint." *Id.* ¶ 91, at 30. Prior to those discussions, AT & T alone had decided to include the arbitration clause in its customer service agreements. After those discussions, this AT & T executive understood that AT & T was not going to be alone in this regard. Then, despite the fact that similar provisions had not been previously widely utilized in the telecommunications industry, AT & T, Sprint, and MCI, the nation's three largest long distance carriers with a collective market share of approximately 60–75%, implemented these provisions almost simultaneously. *See, e.g., Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1159 (5th Cir.1992) (holding the plaintiff's complaint withstood a motion to dismiss where the plaintiff alleged that the "defendants attended seminars and conferences at which arbitration clauses were discussed and that they adopted arbitration clauses knowing that they could do so without fear of competition").

Plaintiffs' complaint also alleges that AT & T, Sprint, and MCI partnered in lobbying groups and made proposals to the FCC on issues concerning the USF contributions and charges. *See, e.g., Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."); *Blomkest Fertilizer, Inc. v. Potash Corp.,* 203 F.3d 1028, 1033 (8th Cir.2000) (en banc) ("[A] high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy."). The complaint also alleges that the long distance telephone market is particularly susceptible to price fixing because the market is controlled by a few dominant companies, namely AT & T, Sprint, and MCI. Further, the complaint alleges that these carriers' actions would have been contrary to their own self interest if they had acted alone because they would have lost market share and profits, but that by acting together their behavior promoted their self-interests because they received supra-competitive profits. *See, e.g., Cayman,* 873 F.2d at 1361 ("The antitrust plaintiff who relies on a theory of conscious parallelism must establish that defendants engaged in consciously parallel action ... which was contrary to their economic self-interest so as not to amount to good faith business judgment" (internal quotations omitted).).

---

**25.** Sprint implemented its arbitration provision one month earlier than AT & T and MCI by way of its tariff that went into effect on July 1, 2001.

These alleged plus factors, combined with defendants' allegedly parallel business behavior, sufficiently state an antitrust claim. Accordingly, defendants' motions to dismiss plaintiffs' post-detariffing antitrust claim are denied.

### b. FCA § 202(a) Discrimination Claim Against AT & T

 FCA § 202(a) does not prohibit all discrimination in rates, only "unjust or unreasonable discrimination ... in connection with like communication service." 47 U.S.C. § 202(a). In determining whether a carrier has violated § 202(a), courts ask: (1) whether the services are like; (2) if so, whether there is a price difference between them; and (3) if so, whether the difference is reasonable. *See Panatronic USA v. AT&T Corp.,* 287 F.3d 840, 844 (9th Cir.2002); *Nat'l Communications Ass'n v. AT & T Corp.,* 238 F.3d 124, 127 (2d Cir.2001); *Am. Message Centers v. FCC,* 50 F.3d 35, 40 (D.C.Cir.1995). AT & T argues that the AT & T plaintiffs have not alleged that the complained-of services are "like" or that any disparity in services is "unreasonable."

Since AT & T filed its motion to dismiss, plaintiffs filed their second amended complaint which adequately pleads these elements. Specifically, the complaint alleges that AT & T overcharges its direct-dial long distance customers, in part to make up for the lack of USF charges on casual caller customers and services that AT & T deems unbillable. It further alleges that "[t]he direct-dial services, direct-dial services that AT & T deems unbillable, and casual caller services that AT & T provides are 'like communications services' for purposes of AT & T's discrimination, pursuant to Section 202 of the Federal Communications Act." Second Am. Compl. ¶ 267, at 56. Further, plaintiffs allege that AT & T's alleged discrimination is unreasonable because it lacks a neutral, rational basis. These allegations certainly state a claim

upon which relief can be granted. Although defendants dispute the accuracy of these allegations, those arguments would be more appropriately raised in a motion for summary judgment, or perhaps in this case resolved by the FCC. *See* Section III, *infra* (referring plaintiffs' FCA claims to the FCC for primary jurisdiction).

AT & T also argues that the AT & T plaintiffs' § 202(a) discrimination claims are partially barred by the applicable statute of limitations. However, plaintiffs allege that the statute of limitations is tolled because defendants actively concealed their illegal overcharges. Second Am. Compl. ¶¶ 116, 132, at 37, 41; *see Industrial Constructors Corp. v. U.S. Bureau of Reclamation,* 15 F.3d 963, 969 (10th Cir. 1994) (defendant's affirmative acts or active deception to conceal the facts giving rise to the claim will toll the statute of limitations for a federal cause of action). Thus, this issue would also be more appropriately addressed in a motion for summary judgment. *See Aldrich v. McCulloch Props., Inc.,* 627 F.2d 1036, 1042 (10th Cir.1980) (plaintiffs' allegations asserting affirmative conduct to conceal the fraud are sufficient to invoke the doctrine of equitable tolling on a motion to dismiss).

Accordingly, AT & T's motion to dismiss is denied with respect to the AT & T plaintiffs' FCA § 202(a) discrimination claim.

### c. The Sprint Plaintiffs' KCPA Claim

 Sprint argues the Sprint customers' KCPA claim should be dismissed because that claim is not pled with sufficient particularity, because plaintiffs failed to plead essential elements of the claim, and because plaintiffs allege only economic loss. Sprint first raised these arguments with respect to plaintiffs' first consolidated and amended class action complaint.

Since then, plaintiffs filed a second amended complaint that alleges this claim with more specificity and adequately states a claim upon which relief can be granted.

The requirement of pleading fraud claims with particularity under Fed. R.Civ.P. 9(b) applies to allegations of deceptive trade practices under the KCPA. *See Burton v. R.J. Reynolds Tobacco Co.*, 884 F.Supp. 1515, 1524 (D.Kan.1995). Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This heightened pleading standard serves to provide defendants with adequate notice of the plaintiff's claim, to protect defendants from reputational damage caused by "improvident charges of wrongdoing," and to "inhibit the institution of strike suits." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir.1992) (quotation omitted). However, "the requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct.'" *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir.1997). Ultimately, in order to survive a motion to dismiss, an allegation of fraud must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Id.* (citing *Lawrence Nat'l Bank v. Edmonds*, 924 F.2d 176, 180 (10th Cir.1991)). "In other words, the plaintiff must set out the 'who, what, where, and when' of the alleged fraud." *Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F.Supp.2d 1201, 1203 (D.Kan. 2001) (citations omitted).

The second amended complaint pleads the Sprint plaintiffs' KCPA claim with the required degree of particularity. The complaint alleges that "Sprint misrepresented the USF surcharge as a legally required 100% 'pass-through' charge on its invoices by designating it as a tax or regulatory charge." Second Am. Compl. ¶ 175, at 51. Thus, plaintiffs have alleged: the "who"—Sprint (specifically, Sprint's billing department); the "what"—the fact that Sprint designated the surcharge as a tax or regulatory fee; the "where"—on the invoices; and the "when"—each month. This allegation is pled with sufficient particularity to place Sprint on notice of the alleged misrepresentations.

Sprint also argues that plaintiffs have failed to allege a willful misrepresentation, which is a necessary element to state a claim under the KCPA. *See* K.S.A. § 50–626(b)(2), (3) (defining a deceptive act as "the willful use, in any oral or written misrepresentation, or exaggeration, falsehood, innuendo or ambiguity as to a material fact" or "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"). Taking all reasonable inferences in the complaint in favor of plaintiffs, as the court must at this procedural juncture, it can reasonably be inferred that Sprint misrepresented a material fact. The complaint alleges that Sprint designated the USF charge as a "tax or regulatory charge." From this, a customer could reasonably infer that the charge was akin to a sales tax where 100% of the revenues would be passed through to the appropriate governmental entities. Further, plaintiffs have adequately alleged causation and injury. The complaint alleges the Sprint plaintiffs received the invoices, reviewed them, and relied on these misrepresentations when paying the invoices. Second Am. Compl. ¶ 175, at 51. Although the four paragraphs encompassing plaintiffs' KCPA claim do not contain the word "willful" when describing Sprint's intent, the complaint as a whole (which is incorporated into the KCPA claim, *see id.* ¶ 173, at 50) alleges that defendants conspired to use the USF program as a secret profit

center. Again, taking all reasonable inferences in plaintiffs' favor, the requisite degree of intent can be inferred from these allegations.

 Sprint also cites *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F.Supp. 1445, 1461 (D.Kan.1995), to argue that plaintiffs are impermissibly attempting to seek alleged contract damages under a tort theory. This argument might have some merit if plaintiffs' KCPA claim was a common law tort claim. However, the KCPA specifically provides that aggrieved consumers may seek relief under the KCPA "[w]hether a consumer seeks or is entitled to damages or otherwise has an adequate remedy at law." K.S.A. § 50–634(a), (c). In other words, damages under the KCPA are in addition to other common law remedies (*e.g.*, damages for breach of contract) that might also be available.

In sum, plaintiffs' second amended complaint adequately states a claim for relief under the KCPA. Accordingly, Sprint's motion to dismiss is denied with respect to the Sprint plaintiffs' KCPA claim.

### d. The AT & T Plaintiffs' New York Consumer Protection Statute Claim

 The New York consumer protection statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). The New York Court of Appeals has held that a plaintiff who alleges he or she has been deceived under this statute must have been deceived in New York, even if the defendant engaged in the allegedly deceptive conduct in New York. *Goshen v. Mutual Life Ins. Co.*, 98 N.Y.2d 314, 323–26, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002); *see also In re Simon II Litig.*, 212 F.Supp.2d 57, 57 (E.D.N.Y.2002) (noting the court in *Goshen* held that "the consumer must be deceived in New York"). Because the New York Court of Appeals is the highest court in New York, this court will defer to that statutory interpretation. *See Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000) ("As a general rule, this Court defers to a state court's interpretation of a state statute."); *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir.2002) ("When the federal courts are called upon to interpret state law, the federal court must look the rulings of the highest state court. . . .").

In this case, the AT & T plaintiffs listed in the second amended complaint include: Roger Gerdes, a California resident; Thomas F. Cummings, a Pennsylvania resident; Darrell D. Gest, a Texas resident; Goldman & Hellman, P.A., a business with its principal place of business in Florida; Lady Di's, Inc., a business with its principal place of business in Indiana; Sterling Beimfohr d/b/a Sterling Sails, a business with its principal place of business in Illinois. It cannot reasonably be inferred from these allegations that any of these plaintiffs have any connection to the state of New York or that they were deceived in New York. Thus, under *Goshen*, these plaintiffs lack standing to assert claims under the New York consumer protection statute, even if AT & T is a New York corporation. Accordingly, AT & T's motion to dismiss is granted with respect to the AT & T plaintiffs' New York consumer protection statute claim.

### e. Breach of Contract Claim

Defendants argue that the complaint fails to state a claim for breach of contract because plaintiffs have failed to allege that defendants breached any specific contractual provision. The court need not decide whether such a specific allegation is required because defendants' argument is

now moot. Plaintiffs' second amended complaint alleges:

> Sprint breached section 10.1 of its "Terms and Conditions" of Schedule No. 3 of its business customers' contracts, and section 4, "Taxes and Surcharges," of its "Sprint Terms and Conditions of Service" for its residential customer contracts. AT & T breached the "General Terms and Conditions" of its Business Service Guide, part of its business customer contracts, and the "Miscellaneous Charges and Taxes" section of its Service Guide that constitutes part of its residential customer contracts.

Second Am. Compl. ¶ 183, at 52–53. Thus, plaintiffs' complaint now alleges which specific contractual provisions defendants allegedly breached. Accordingly, defendants' motions to dismiss are denied with respect to plaintiffs' breach of contract claim.

## III. DEFENDANTS' MOTION FOR REFERRAL TO THE FCC

 Defendants also ask the court to refer this case to the FCC under the doctrine of primary jurisdiction, and to dismiss or stay this action pending that referral. " 'Primary jurisdiction is invoked in situations where the courts have jurisdiction over the claim from the very outset but it is likely that the case will require resolution of issues which, under a regulatory scheme, have been placed in the hands of an administrative body.' " *Mical Communications, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1038 (10th Cir.1993) (quoting *Marshall v. El Paso Nat. Gas Co.*, 874 F.2d 1373, 1376 (10th Cir.1989)). The doctrine allows courts to suspend the judicial process while those issues are referred to the administrative body. *Id.* It "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1

L.Ed.2d 126 (1956); *accord Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir.1996) (quoting *W. Pac. R. Co.*, 352 U.S. at 63, 77 S.Ct. 161). Its twin purposes are to ensure desirable uniformity with respect to certain types of administrative questions, and to promote the use of agencies' experience and expertise when courts are presented with questions outside their conventional expertise. *W. Pac. R. Co.*, 352 U.S. at 64, 77 S.Ct. 161; *Williams Pipe Line*, 76 F.3d at 1496. Therefore, courts should generally refer matters to administrative agencies where issues of fact are not within the conventional experience of judges, require the exercise of administrative discretion, or require uniformity and consistency in regulating the business entrusted to a particular agency. *Mical*, 1 F.3d at 1038 (quoting *Marshall*, 874 F.2d at 1377).

 In this case, all of these considerations warrant referral of plaintiffs' FCA §§ 201(b) and 202(a) claims to the FCC. First, the court wishes to promote the use of the FCC's considerable experience and expertise regarding carriers' USF fund recovery practices. The FCC administers the USF program, it has been involved in ongoing rulemaking proceedings regarding carriers' USF assessment and recovery practices, and it has exercised its regulatory powers to audit carriers' USF collections. *See, e.g., Self v. BellSouth Mobility, Inc.*, 111 F.Supp.2d 1169, 1173 (N.D.Ala. 2000) (recognizing the FCC "possesses much greater experience in the area of the universal service program").

In addition, plaintiffs' FCA claims require the exercise of administrative discretion. Plaintiffs' § 201(b) claim alleges that defendants' USF fund recovery practices were unjust and unreasonable, and the AT & T plaintiffs' § 202(a) claim alleges that AT & T unreasonably discriminated against its direct-dial long distance

customers. *See* 47 U.S.C. §§ 201(b) (requiring carriers' charges to be "just and reasonable"), 202(a) (prohibiting "unreasonable discrimination"). These claims involve "reasonableness" determinations that are inherently discretionary determinations within the FCC's realm of authority. *See Ambassador, Inc. v. United States,* 325 U.S. 317, 324, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945) (claims "grounded in [a] lack of reasonableness" must be addressed in the first instance "to the Commission and not as an original matter brought to the court"); *In re Long Distance Telecomm. Litig.,* 831 F.2d 627, 631 (6th Cir.1987) (holding claims of unreasonableness must be referred to the FCC because they involve a "determination that Congress has placed squarely in the hands of the FCC"); *see, e.g., Cromwell v. Sprint Corp.,* 248 F.Supp.2d 1024, 1026–27 (D.Kan.2003) (referring a § 201(b) claim to the FCC); *Niehaus v. AT & T Corp.,* 218 F.Supp.2d 531, 537 (S.D.N.Y.2002) (referring a § 201(b) claim to the FCC because it involved a "reasonableness" determination); *Digital Communications Network, Inc. v. AT & T Wireless Servs.,* 63 F.Supp.2d 1194, 1199–1202 (C.D.Cal.1999) (referring §§ 201(b) and 202(a) claims to the FCC); *Kiefer v. Paging Network, Inc.,* 50 F.Supp.2d 681, 684 (E.D.Mich.1999) (referring a § 201(b) claim to the FCC).

Also, as discussed in Section I(B)(1), *supra,* determinations regarding the propriety of defendants' rates, terms, and conditions of service should remain subject to a uniform body of federal law. Referring plaintiffs' FCA claims to the FCC will promote this uniformity. Plaintiffs argue that uniformity will be ensured in this case without referring their claims to the FCC because all of the claims against AT & T and Sprint regarding their USF fund recovery practices have been consolidated in this case. The court disagrees. These cases are consolidated for pretrial purposes, not for trial, and therefore a risk of inconsistent judgments on those claims still exists. Further, allowing the FCC to adjudicate the propriety of AT & T and Sprint's USF fund recovery practices will provide industry-wide standards for AT & T and Sprint as well as other long distance carriers who are not parties to this lawsuit. *See, e.g., Access Telecommunications v. Southwestern Bell Tel. Co.,* 137 F.3d 605, 608 (8th Cir.1998) (recognizing that the doctrine of primary jurisdiction is designed to, among other things, "promote uniformity and consistency *within the particular field of regulation* " (emphasis added)).

The court is not, however, persuaded by defendants' argument that plaintiffs' post-detariffing antitrust, KCPA, and breach of contract claims should be referred to the FCC. As discussed in Section II(B)(3), *supra,* those claims are not based upon the propriety of defendants' USF fund recovery practices. Rather, the antitrust claim arises from the manner in which defendants allegedly conspired to implement similar USF fund recovery practices and shield themselves from liability for those practices, the KCPA claim arises from Sprint's alleged deception of its customers, and the breach of contract claim arises from defendants' alleged failure to abide by their own rates, terms, and conditions of service. Although some of these claims may have been appropriately referred to the FCC during the era of the filed-rate doctrine, the FCC has ruled that these types of claims no longer fall within the purview of the FCA (nor presumably the FCC) in the detariffed environment. *See* Section II(B)(3), *supra; Order on Reconsideration, supra,* ¶ 77, at 15,057, 1997 WL 473330.

Further, this court is unpersuaded that this case should remain stayed while the FCC makes its initial determination regarding plaintiffs' FCA claims. Although

the court can certainly envision that the FCC's determinations regarding plaintiffs' FCA claims could ultimately be relevant to resolving plaintiffs' post-detariffing antitrust, KCPA, and breach of contract claims, those claims nevertheless involve numerous other legal and factual aspects. Therefore, the court will allow the parties to pursue discovery on those claims while the action with the FCC is pending in the hopes that discovery on plaintiffs' other remaining claims will be complete by the time the FCC renders its decision on plaintiffs' FCA claims.

Accordingly, the court will refer plaintiffs' FCA §§ 201(b) and 202(a) claims to the FCC to initially evaluate the merits of those claims. Meanwhile, the stay on discovery is lifted and the parties may proceed with discovery on plaintiffs' post-detariffing antitrust, KCPA, and breach of contract claims.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motions to compel arbitration (Docs. 68 & 75) are granted in part and denied in part. Specifically, they are granted with respect to all of plaintiffs Thome, Bryan, and Tiffany's claims against Sprint. Further, they are granted with respect to plaintiff Cummings' claims against AT & T except insofar as his antitrust, FCA § 202(a), New York consumer protection statute, and money had and received claims are based on USF fund pass-through charges prior to August 1, 2001. The court will also compel arbitration of the residential plaintiffs' antitrust claims against long distance carriers other than their own, except that the court will not compel plaintiff Cummings to arbitrate his antitrust claim against Sprint insofar as that claim is based on USF fund pass-through charges prior to August 1, 2001. The residential plaintiffs' arbitrable claims are stayed until further order of the court.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendants' motions to dismiss (Docs. 71 & 77) are granted in part and denied in part. Specifically, they are granted with respect to plaintiffs' declaratory judgment, New York consumer protection statute, and money had and received claims as well as plaintiffs' pre-detariffing antitrust and KCPA claims. They are, however, denied with respect to plaintiffs' FCA §§ 201(b) and 202(a) claims as well as plaintiffs' post-detariffing antitrust, KCPA, and breach of contract claims.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendants' joint motion to dismiss or stay and for referral to the FCC under the doctrine of primary jurisdiction (Doc. 73) is granted in part and denied in part. Specifically, the court will refer plaintiffs' FCA §§ 201(b) and 202(a) claims to the FCC to exercise primary jurisdiction over those claims. Defendants' motion is denied, however, with respect to plaintiffs' post-detariffing antitrust, KCPA, and breach of contract claims. If plaintiffs wish to pursue their FCA §§ 201(b) and 202(a) claims, they shall commence an action against defendants with the FCC on or before **January 5, 2004.** Pending the referral of plaintiffs' FCA claims to the FCC, the parties shall be allowed to proceed with discovery on plaintiffs' post-detariffing antitrust, KCPA, and breach of contract claims.